## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

**ROBERT DEFORIS KORNAGAY,**

     **Plaintiff,**

**v.**                    **Case No.: 3:09cv281-LC/EMT**

**OFFICER BURT, et al.,**

     **Defendants.**

_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants **Burt**, **Covan**, **Engstrom**, **Gielow**, **Grace**, **Orsa**, and **Raybon**, through undersigned counsel, submit this Motion for Summary Judgment pursuant to Rule 56, Federal Rules of Civil Procedure.  Defendants request that summary judgment be granted in their favor. Additionally, Defendants request Plaintiff be given a "strike" under 28 U.S.C. § 1915(e)(2)(B) and sanctions recommended against him under section 944.279, Florida Statutes, for filing a frivolous, false, and/or malicious claim.

### PRELIMINARY STATEMENT

Plaintiff Kornagay is an inmate in the custody of the Florida Department of Corrections ("FDOC") serving a life sentence.  (Exh. A)  Defendants are employees of the FDOC.  Plaintiff has filed a fourth amended civil rights

complaint alleging violations of the First Amendment and Eighth Amendment of the U.S. Constitution.  (Doc. 78: 6-12)

## PLAINTIFF'S ALLEGATIONS AND RELIEF REQUESTED

Plaintiff alleges the following:   On October 5, 2008, Plaintiff filed a grievance against Officer Burt.  (Doc. 78: 6)  On October 10, 2008, Officer Burt made a statement to Plaintiff including the comment, "Payback is a motherf**ker." (Id.)  Plaintiff also states Officer Burt threatened to conspire with unnamed officers to write false disciplinary reports against Plaintiff.  (Id.)

Plaintiff states that because of the October 5 grievance, and three others he filed in October[1] against Officer Burt, the following occurred:  1) a false and retaliatory disciplinary report ("DR") was filed on October 10, 2008 by Officer Covan; 2) a false and retaliatory DR was filed on October 17, 2008 by Officer Engstrom; 3) on October 21, 2008, Officer Gielow verbally ordered Officer Raybon to spray Plaintiff with chemical agents; 4) on October 21, 2008 two false and retaliatory DRs were filed by Officer Grace; 5) on October 22, 2008, Plaintiff was falsely accused of creating a disturbance, sprayed with chemical agents, and written a false DR; and 6) Officer Burt destroyed his mail.  (Doc. 78: 6-9)

Plaintiff further asserts he was placed on a management meal without justification (Doc. 78: 8); he was sprayed with chemical agents without

---

[1] Grievances filed October 12, 15, and 17. (Doc. 78: 7)

justification (Doc. 78: 9); and he was knowingly placed into a cell which was not properly decontaminated (Doc. 78: 9-10).

Plaintiff does not specifically state whether he is suing Defendants in their official or individual capacity.[2]   Plaintiff seeks nominal, compensatory, and punitive damages as well as legal costs and fees.  (Doc. 78: 12, 14)

### STATEMENT OF MATERIAL AND GENUINE FACTS

1.      Plaintiff has had numerous DRs since his entrance to the FDOC in 2003, including DRs for Lying to Staff, Unarmed Assault, and Spoken Threats. (Exh. A)

2.      During September and October of 2008, Plaintiff became increasing belligerent.  Inmate Kornagay was verbally antagonistic, was often yelling on his housing wing, and was often cursing into the wing.  (Exh's A, B, and C: 5, 7, 10, 12)  Any attempt by an officer to get Plaintiff to cease his disruptive behavior led to a grievance being filed against the officer.[3]  (Exh. B: ¶¶ 8-11)

---

[2]  Per the Eleventh Amendment, Defendants are immune from suits for damages in their official capacity.

[3]  Officer Burt states in his affidavit, "Due to these unfounded grievances against me, I attempted to limit my interaction with inmate Kornagay.  Nonetheless, inmate Kornagay continuously tried to bait me into having interaction with him so that he could continue to write grievances against me. These attempts to bait me by inmate Kornagay did not in any way inspire or provoke me to illegally retaliate against inmate Kornagay.  These attempts to bait me by inmate Kornagay did not in any way inspire or provoke me to ask anyone else to illegally retaliate against inmate Kornagay."  (Exh. B)

3.      On September 29, 2008, Plaintiff was written a DR for Lying to Staff. He was found guilty and placed in disciplinary confinement for sixty days.  (Exh. D)

4.      On October 5, 2008, Plaintiff filed a grievance against Officer Burt because Burt allegedly told Plaintiff that he could not talk to or sit next to certain inmates.  (Exh. E: 1)  It is noted that Plaintiff was seeking a change of dorm which may have been the underlying reason for all of Plaintiff's allegations.  (Id.)

5.      On October 8, 2008, Plaintiff refused to put on the proper uniform. This action led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing.  (Exh. C: 5)

6.      At 4:00 p.m. on October 10, 2008, Plaintiff was yelling on the wing and arguing with staff.  These actions led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing.  (Exh. C: 5)

7.      At 6:00 p.m. on October 11, 2008, Plaintiff was written a DR for Spoken Threats by Officer M. Covan.  The DR stated in pertinent part:

> Inmate Kornagay, Robert DC#J13805 is being charged with a violation of FAC chapter 33-601.314 rules of prohibited conduct (1-3) Spoken or Written Threats.  On 10/10/08 I was assigned as a D-dormitory housing officer.   At approximately 9:30pm, I was conducting a security check in wing three when I overheard yelling coming from D3115, where inmate Kornagay, Robert DC#J13805 is housed with inmate Sanderson, John DC#J24620.  I observed inmate Kornagay standing up in the cell yelling at inmate Sanderson who was lying on the top bunk.  I ordered inmate Kornagay to stop yelling and he replied, "Shut the f*ck up!  Y'all always be f*cking with me.  I'm

4

gonna kick your punk ass when I get the chance."  I again ordered inmate Kornagay to stop yelling and inmate Kornagay replied, "F*ck yourself" and sat on his bed and refused to reply to my attempts to counsel with him.

He was found guilty of the DR and placed in disciplinary confinement for thirty days.  (Exh. G)  An IG investigation was initiated due to the threat by Plaintiff. (Id.)  The IG report noted that the State Attorney's Office does not routinely prosecute such actions.  (Id.)

8.    At 3:00 p.m. on October 16, 2008, Plaintiff was yelling on the wing during count.  At 6:30 p.m. on the same day, Plaintiff improperly attempted to talk to other inmates while in the CM3 dayroom.   These actions led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing.  (Exh. C: 7)

9.    On October 17, 2008, Plaintiff was written another DR for Spoken Threats by Officer J. Engstrom.[4]  The DR stated in pertinent part:

> Inmate Kornagay, Robert DC#J13805 is being charged with a violation of FAC chapter 33-601.314 rules of prohibited conduct (1-3) Spoken, Written, or Gestured Threats.  On 10/17/08 I was assigned as a D-dormitory housing officer.  At approximately 7:40pm, I was responding to a disturbance in wing 3 when I was directed to cell D3115 where inmate Kornagay, Robert DC#J13805, who is housed in D3115L, was beating his desk in his cell singing, "F*ck the police."

---

[4] Officer Engstrom stated the following in his affidavit, "During my time working the same wing that housed inmate Kornagay, he was always a problem inmate.  He liked to make threats against me and on numerous occasions threatened physical harm against me.  Also, on one occasion inmate Kornagay called me up to his cell only to pass gas on me.  I rarely write disciplinary reports, but I wrote the October 17, 2008 disciplinary report so that inmate Kornagay would stop threatening me."  (Exh. H: ¶¶ 6-8)

> I ordered inmate Kornagay to stop singing and he stated to me, "The only way I'm gonna stop singing is if I get out of this cell and beat your country ass!"  I again ordered inmate Kornagay to stop his disruptive behavior and he stated, "[You're] lucky I'm feeling good, I'm gonna stop for now."

He was found guilty of the DR and placed in disciplinary confinement for thirty days.  (Exh. I)  An IG investigation was initiated due to the threat by Plaintiff. (Id.)  The IG report noted the facts were known and that the threat was a management issue.  (Id.)

10.    On October 18, 2008 at 6:00 p.m., Plaintiff was yelling on the wing about not being able to come to the dayroom.  This action led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing.  (Exh. C: 7-8)

11.    At 6:18 p.m. on October 21, 2008, Plaintiff was disrespectful to staff when he raised his middle finger at Officer Burt in a "f*ck you" gesture while Burt was supervising the dayroom.  Plaintiff then pointed to his pen and made a throat slitting gesture with his finger.   This action led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing. (Exh. C: 9-10; B: ¶ 8)

12.    At 7:00 p.m. on October 21, 2008, Plaintiff improperly attempted to communicate with other inmates in the dayroom.  This action led to Plaintiff receiving an unsatisfactory mark on his daily record of special housing. (Exh. C: 9)

13.    At 9:40 p.m. on October 21, 2008, Plaintiff was written a DR for Assault or Attempted Assault on a Correctional Officer by Officer C. Grace.  The DR stated in pertinent part:

> Inmate Kornagay, Robert DC#J13805 is being charged with violation of FAC chapter 33-601.314, rules of prohibited conduct, 1-19 Assault or Attempted Assault on a Correctional Officer.  On 10/21/08 I was assigned as a D-dorm housing officer.  At approx. 9:30 pm I was conducting a security check in wing 3 when I overheard loud yelling coming from D3115, where inmate Kornagay is housed.   As I approached the cell I observed inmate Kornagay yelling into the cell vent.  I ordered inmate Kornagay to cease his disorderly behavior and he replied, "Just shut the f*ck up.  You don't want to f*ck with me."  Inmate Kornagay then began yelling into the vent again.  I again ordered inmate Kornagay to stop yelling and he replied "You want some of this here!"  Inmate Kornagay then spat at the cell window just below the vent holes in an attempt to spit on me, without success.  I then contacted the dorm supervisor.  Inmate Kornagay wiped the spit off the cell window when I called for the dorm sergeant and he then ceased his behavior when Sergeant Stewart arrived.

He was found guilty of the DR and placed in disciplinary confinement for sixty days.  (Exh. J)  Due to his actions, Captain A. Jackson recommended Plaintiff for a special management meal and, for the safety of staff, Captain Jackson recommended Plaintiff wear a special management spit shield.   (Id.)   An IG investigation was initiated due to the attempted assault by Plaintiff.  (Id.)  The IG report noted that the State Attorney's Office does not routinely prosecute such actions.  (Id.)

14.    At 10:21 p.m. on October 21, 2008, Plaintiff was kicking his cell door.  (Exh. C: 9-10)

15.    At 10:50 p.m. on October 21, 2008, Plaintiff was written a DR for Battery or Attempted Battery on a Correctional Officer by Officer C. Grace.  The DR stated in pertinent part:

> Inmate Kornagay, Robert DC#J13805 is being charged with violation of FAC chapter 33-601.314, rules of prohibited conduct, 1-15 Battery or Attempted Battery on a Correctional Officer.  On 10/21/08 I was assigned as a D-dorm housing officer.  At approx. 10:30 pm I was conducting a security check in wing 3 when I passed D3115, where inmate Kornagay is housed alone.  Inmate Kornagay spit an unknown liquid at me, through a security pen, that was stuck through one of the vent holes, striking me in the chest.  I then called Sergeant Stewart to the wing.  Inmate Kornagay ceased his disruptive behavior when Sergeant Stewart arrived.

He was found guilty of the DR and placed in disciplinary confinement for sixty days.  (Exh. K)

16.    On the night of Oct 21-22, 2008, inmate Kornagay was counseled numerous times about creating a disturbance.  Inmate Kornagay was kicking his door at approximately 10:45 p.m. on October 21, 2008.  Sgt. Raybon counseled inmate Kornagay to stop kicking the door at approximately 11:00 p.m.  Lieutenant P. Orsa counseled at approximately 11:05 p.m. At this time inmate Kornagay ceased his disruptive behavior.  (Exh's L, M, N)

17.    At approximately 12:00 a.m. on October 22, 2008, Sergeant Raybon responded to a disturbance in wing three of D-dormitory coming from cell D3115L, where Plaintiff was housed.  Plaintiff was again creating a disturbance by kicking his cell door and yelling obscenities.  Sergeant Raybon counseled Plaintiff

and ordered him to cease his behavior.  Plaintiff refused to comply and continued to kick his cell door and yell obscenities into the wing.  At approximately 12:08 a.m. Sgt. Raybon again counseled Plaintiff at the cell front and ordered him to cease his disruptive behavior.  Plaintiff refused to comply. (Exh's L, M, N)

18.    At approximately 12:14 a.m., Sergeant Raybon contacted Lieutenant P. Orsa to notify him of the situation.  Sergeant Raybon also informed Lieutenant Orsa of his attempts to counsel with Plaintiff.  (Exh's L, M, N)

19.    Lieutenant Orsa entered D-dormitory.  At approximately 12:26 a.m. Lieutenant Orsa and Sergeant Raybon counseled Plaintiff at his cell front. Lieutenant Orsa issued Plaintiff a verbal order to cease his disruptive behavior. Lieutenant Orsa's attempts to counsel with Plaintiff were ineffective Plaintiff continued to disrupt the housing unit by kicking the cell door and yelling obscenities into the wing.  (Exh's L, M, N)

20.    Lieutenant Orsa reviewed Plaintiff's Chemical Agent Risk Assessment Form at approximately 12:29 a.m. which stated that based on a review of the medical records at the time of his pre-confinement health appraisal, inmate Kornagay had no known medical condition that may be exacerbated by the use of chemical restraint agents.  (Exh's L, M, N)

21.    At about 12:30 a.m., Lieutenant Orsa contacted Senior Registered Nurse S. Derrick who stated to me that Plaintiff had no known medical condition that may be exacerbated by the use of chemical restraint agents.  (Exh's L, M, N)

22.    At approximately 12:34 a.m., Lieutenant Orsa contacted the Duty Warden, Warden D. Ellis and advised him of the situation regarding Plaintiff. Lieutenant Orsa was given authorization to use chemical agents, if necessary, to quell the disturbance Plaintiff was creating in the dormitory.  (Exh's L, M, N)

23.    At approximately 12:35 a.m., Officer C. Klein retrieved the D-dormitory video recorder and started video recording procedures for a possible chemical agent use of force on Plaintiff.  (Exh's L, M, N)

24.    At approximately 12:37 a.m., Lieutenant Orsa conducted a brief lead in statement, introduced the staff involved and their attempts to quell the disturbance Plaintiff was creating, and stated what he (Lieutenant Orsa) had done in his attempts to quell the disturbance Plaintiff was creating in the dormitory. Lieutenant Orsa had counseled Plaintiff to cease his actions in an attempt resolve the matter without having to use force.  (Exh's L, M, N)

25.    At approximately 12:38 a.m. Captain Shroyer, Officer Klein, and Lieutenant Orsa entered wing three.  At approximately 12:39 a.m., Lieutenant Orsa approached cell D3115, counseled with Plaintiff on camera, and issued him a final order to cease his disruptive behavior.  Lieutenant Orsa informed Plaintiff that if he

did not stop causing a disturbance, Lieutenant Orsa would utilize chemical agents to quell the disturbance he was creating.  (Exh's L, M, N)

26.    Plaintiff complied with Lieutenant Orsa's order and ceased creating a disturbance.  Lieutenant Orsa further informed Plaintiff that if he resumed his disorderly behavior after Officer Klein and he (Lieutenant Orsa) left the area, the final order would not be repeated prior to the application of chemical agents. (Exh's L, M, N)

27.    At approximately 12:47 a.m. Lieutenant Orsa conducted a brief closing statement and the video recording ceased.  (Exh's L, M, N)

28.    At approximately 1:10 a.m. Plaintiff again began his disruptive behavior by kicking the cell door and yelling obscenities in the wing.    At approximately 1:11 a.m. Sgt. Raybon informed Lieutenant Orsa that Plaintiff had disregarded his final warning and was once again disrupting the normal operation of the housing unit.  (Exh's L, M, N)

29.    At approximately 1:13 a.m. Lieutenant Orsa withdrew and weighed chemical agent OC, Sabre Red OC MK-9 HVF canister number 104, serial number 1193293 from the D-dormitory secure storage area.  Sergeant Raybon was given the chemical agent canister at approximately 1:15 a.m.  By order of Lieutenant

Orsa[5], Sergeant Raybon administered three once second bursts of chemical agent through the opened hand cuffing portal of cell D3115 at Plaintiff. A total of 109 grams of chemical agent was administered. At approximately 1:16 a.m., Plaintiff ceased his disruptive behavior. (Exh's L, M, N)

30.     Plaintiff was issued clean boxers and was taken to medical for a post use of force examination. No injuries to Plaintiff were noted. (Exh's N, Q: 24-25)

31.     Plaintiff was taken to decontaminated cell D3115L and at approximately 1:47 a.m. Plaintiff was issued clean linens, mattress, clothing, and property. (Exh's L, M, N)

32.     At 4:00 a.m. on October 22, 2008, Plaintiff was written a DR for Participating in a Minor Disturbance by Officer G. Raybon. The DR stated in pertinent part:

> Inmate Kornagay, Robert DC#J13805 is being charged with violation of FAC chapter 33-601.314, rules of prohibited conduct, 2-3 Participating in a Minor Disturbance. On 10/22/08 I was assigned as the D-dorm housing supervisor at Santa Rosa Correctional Institution Main Unit. At approx. 12:05 am I observed inmate Kornagay, housed alone in cell D3115L, yelling in the wing and kicking on the cell door. I counseled with inmate Kornagay concerning his behavior. Inmate Kornagay refused to comply and continued to cause a disturbance in the housing unit. Chemical agents had to be utilized to quell the disturbance that inmate Kornagay was creating in the dormitory.

---

[5] Lieutenant Gielow did not order Sergeant Raybon to spray Plaintiff with chemicals on October 21 or 22 of 2008. (Exh. O) Gielow and Raybon did not work the same shift on October 21-22, 2008. (Exh. P)

Plaintiff was found guilty of the DR and placed in disciplinary confinement for thirty days. (Exh. R) Plaintiff also had the following privileges suspended due to the October 22, 2008 incident: phone, visitation, dayroom, exercise, and out-of-cell educational programs. (Id.)

33.    Lieutenant D. Harris and Officer D. Shroyer witnessed Plaintiff's disruptive behavior on the night of October 22, 2008 and witnessed the use of force against Plaintiff. Both Harris and Shroyer state that the use of force was necessary for the security of the institution and accomplished in accordance with the FDOC procedures. (Exh's S, T)

34.    Throughout the alleged retaliation and after, Plaintiff continued to file numerous grievances against the staff on D-dormitory. (Exh's E, F, U)

35.    The DRs given to Plaintiff during October of 2008 and the chemicals utilized on Plaintiff on October 22, 2008 were done solely due to Plaintiff's violation of prison regulations and/or Plaintiff's refusal to obey lawful orders. (Exh's H, L, M, S, T, V, W)

36.    At the time of the alleged acts of retaliation, Officers Covan, Engstrom, Grace, Orsa, and Raybon had no knowledge of the grievances filed against Officer Burt by Plaintiff in September and October of 2008. (Exh's H, L, M, V, W)

37.    Oleoresin Capsicum ("OC") is an organic oily resin derived from the pepper plant.  OC, in most cases, requires no special decontamination procedures. OC is biodegradable and unlike chemical irritants, OC does not linger in clothing or affected areas.  Also, unlike chemical irritants which are pain inducers and tearing agents, OC causes an incapacitating inflammatory response.  The primary effects of exposure to OC are pain and irritation of the mucous membranes of the eyes, nose, and lining of the mouth.  OC vapors cause pulmonary irritation and prolonged coughing.  After a subject is sprayed with OC, an officer only needs to provide water for flushing eyes and skin and proper ventilation.  No long term effects are known to be caused by OC.  (Exh's X, Y at N.I.J. Report pp.1-2; D.O.E. Sandia Report pp. 3, 7, 11-12; Dept. of Navy J.A.G. Report pp. 2-3, 7)

38.    After application of chemical agents, a cell is decontaminated by washing the walls and fixed structures with soapy water.  Plaintiff's cell was decontaminated after the October 22, 2008 use of chemical agents.  Plaintiff was issued clean linens, a clean mattress, and clean clothing and property.  Also, Plaintiff was allowed to take a cold water shower.  Even in a decontaminated cell, residual chemical agents may cause a slight tickle in one's throat and coughing for up to an hour after the cell is decontaminated.  However, the residual effects are minimal and dissipate quickly.  (Exh's L, M, N, X: answer to question twelve)

39.    Plaintiff was not injured during the October 22, 2008 use of force. (Exh. Q: 24-25)  There is no medical documentation that Plaintiff was injured in any way due to the October 22, 2008 use of chemical agents.  (Exh. Q: 5-6)

40.    Plaintiff's placement on close management was continued due to his bad behavior during the October 2008 period.  His continued placement there was reviewed and approved by the Institutional Classification Team.  (Exh. Z: 13-14)

## MEMORANDUM OF LAW

**I.    Plaintiff has not established a retaliation claim in violation of the First Amendment.**

In order to state a First Amendment retaliation claim, "a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).

As to the first prong, Plaintiff's filing of grievances is protected speech. Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008).

As to the second prong, there is no indication from the record that the Defendants' alleged retaliatory conduct adversely affected the protected speech (i.e., filing grievances) of Plaintiff.  See Marsh v. Florida Dept. of Corrections, No. 08-12222, 2009 WL 1362055 (11th Cir. May 18, 2009) (affirming dismissal of retaliation claim where Marsh failed to allege any facts showing that the retaliatory

actions have had an adverse impact on his ability to file civil rights actions with the district court) (Exh. AA).[6] From the beginning of October of 2008 through January of 2009, Plaintiff's filing of grievances was undeterred by any alleged retaliation. (Exh's E, F, U). Plaintiff's deluge of grievances filed during and after the time period involved in the litigation makes laughable his allegation of a chilled right to file grievances. (Doc. 78: 11)

Even though the alleged retaliation failed to affect Plaintiff's filing of grievances, Defendants will nonetheless address whether a causal connection exists. Plaintiff asserts that his filing of four grievances against Officer Burt led Officer Burt to employ other officers to write Plaintiff false DRs and to spray Plaintiff with chemicals for no valid reason. (Doc. 78: 6-9) Plaintiff also states that Officer Burt destroyed a piece of his mail.[7] (Id. at 7)

The following events, and not the speculative and unsupported reasons given by Plaintiff in his Fourth Amended Complaint, led to the DRs being written and the utilization of chemical agents against Plaintiff.

---

[6] In this case, Plaintiff continued to file written grievances and make verbal grievances after the alleged retaliation began. (Doc 78: 6-7) Plaintiff fails to allege any facts showing that the retaliatory actions had an adverse impact on his ability to file grievances. It is noted that the Eleventh Circuit has adopted the "ordinary firmness" test. Bennett v. Hendrix, 423 F.3d 1247, 1251-52 (11th Cir. 2005).

[7] Officer Burt denies destroying any of Plaintiff's mail. (Exh. B: ¶ 4) Furthermore, Plaintiff has not provided any evidence that he was ever sent the mail which was allegedly destroyed. Even assuming, arguendo, that Officer Burt did destroy Plaintiff's mail, the action failed to deter Plaintiff in his grievance writing. (Doc. 78: 7; Exh's E, F, U)

Plaintiff was written the October 10, 2008 DR for "Spoken Threats" solely because he broke prison rules and threatened a correctional officer.  (Exh.W: ¶ 6)  Plaintiff was found guilty of the DR and the DR was not overturned[8] during the administrative process.  (Exh's A, F: 18-25, G)

---

[8] Since an inmate is presumed to have committed an act he was not entitled to perform if the DR has not been overturned, there is simply no constitutional wrong to address in a section 1983 action claiming a false and retaliatory DR if the DR is not first overturned.  In other words, the adjudication of guilt for violating a prison rule gives that DR the imprimatur of a proper penological response and undercuts any allegation that the DR was an improper or retaliatory action.  This is so because any possible causal connection between a protected activity and the harm (i.e., the DR) is severed since the harm is not in reaction to a protected activity, but directly in response to an improper activity.  Other possible motivating factors for issuing the DR are irrelevant if the prisoner, in accordance with due process requirements, was found to have committed the wrong.  Cf. Draper v. Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004) (stating that "ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred").  Any other approach vis-à-vis DRs would encourage prisoners to ceaselessly attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  See also Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994) ("The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions").  Federal courts should not be in the business of weighing a correctional officer's motives for writing an inmate a legitimate DR.  Institutional security and discipline are central concerns in a prison setting, and where an inmate violates prison rules, he must be punished.  Allowing prisoners to file a section 1983 action in federal court to challenge every DR as false and/or retaliatory would be enormously onerous to prison administration and would likely cause correctional officers to think twice before disciplining litigious inmates.  This approach would give litigious inmates free reign to flout prison rules.  Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990). Furthermore, federal courts would become the primary arbiters of every act of prison discipline. Cf. Turner v. Safley, 482 U.S. 78, 89 (1987) (stating that federal courts should not become the primary arbiters of what constitutes the best solution to every administrative problem and that such a policy would unnecessarily perpetuate the involvement of the federal courts in affairs of prison administration).  Correctional officers, who are on the front line of maintaining security and discipline, must be able to do their jobs without the prospect of federal litigation hanging over every disciplinary decision.  After all, "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams, 40 F.3d at 74.

Plaintiff was written the October 17, 2008 DR for "Spoken Threats" solely because he broke prison rules and threatened a correctional officer. (Exh. H: ¶ 6) Plaintiff was found guilty of the DR and the DR was not overturned during the administrative process. (Exh's A, E: 30-33, I)

Plaintiff was written the October 21, 2008 DR for "Attempted Assault of a Correctional Officer" solely because he broke prison rules and attempted to spit on a correctional officer. (Exh. V: ¶ 7) Plaintiff was found guilty of the DR and the DR was not overturned during the administrative process. (Exh's A, J)

Plaintiff was written the October 21, 2008 DR for "Battery of a Correctional Officer" solely because he broke prison rules and spit on a correctional officer. (Exh. V: ¶ 7) Plaintiff was found guilty of the DR and the DR was not overturned during the administrative process. (Exh's A, F: 1-7, K)

Plaintiff was written the October 22, 2008 DR for "Participating in a Disturbance" solely because he broke prison rules and caused a disturbance by yelling into the wing and kicking his cell door. (Exh's L: ¶ 22) Plaintiff was found guilty of the DR and the DR was not overturned during the administrative process. (Exh's A; F: 11-17, 57; R)

Plaintiff had chemical agents utilized against him because he was causing a disturbance on the wing for hours and refused to stop. (Exh's L, M, N) His actions were a security concern and needed to be stopped. (Exh's L, M, N, S, T)

Plaintiff was given numerous warnings prior to having chemical agents utilized against him.  (Exh's L, M, N)

Plaintiff asserts that the aforementioned DRs were written and that he had chemical agents utilized against him due to Plaintiff's filing of grievances against Officer Burt.  This is impossible as the officers who wrote the DRs and the officers involved in utilizing chemical agents against the Plaintiff did not know of the grievances that had been filed against Officer Burt.  (Exh's H, L, M, V, W)  Thus, there is no causal connection between the alleged right (i.e., filing grievances) and the alleged retaliatory conduct.  See Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) ("The relevant showing in such cases must be more than the prisoner's 'personal belief that he is the victim of retaliation.'").

Plaintiff has no proof of a conspiracy and simply makes unsupported allegations in an effort to assign malice to acts of legitimate discipline by correctional officers.  Defendants cannot be held responsible for simply performing their jobs and disciplining a highly belligerent and disruptive inmate.  See Turner v. Safley, 482 U.S. 78, 89 (1987) (stating that federal courts should not become the primary arbiters of what constitutes the best solution to every administrative problem and that such a policy would unnecessarily perpetuate the involvement of the federal courts in affairs of prison administration).  See also Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993) ("[I]f the discipline which the prisoner claims to

have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail"); Cowans v. Warren, 150 F.3d 910, 912 (8th Cir. 1998) (stating that an inmate cannot state a claim for retaliatory disciplinary proceedings where the discipline was imparted for acts that a prisoner was not entitled to perform) (citing Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990)); Thaddeus-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999) (stating that if a prisoner violates a legitimate prison regulation, he is not engaged in "protected conduct"); Smith v. Fla. Dept. of Corr., No. 07-13752, 2008 WL 781824, *2 (11th Cir. Mar. 25, 2008) ("Smith has failed to state a claim for retaliatory disciplinary proceedings against both defendants because the disciplinary order he challenges was properly filed after Smith disobeyed an order to cooperate with the transfer, and not because he had filed lawsuits or administrative grievances") (Exh. BB)

Furthermore, conclusory allegations of retaliation without "some facts" that would indicate that the retaliatory act was in retaliation for filing grievances is not sufficient.  See White v. Thompson, No. CV406-207, 2007 WL 2324613, at *1 (S.D.Ga. June 20, 2007) (Exh. CC).  See also Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (stating that a prisoner may establish retaliation by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'").  The allegations must be more

than "general attacks" upon a defendant's motivations, a plaintiff must produce "affirmative evidence" of retaliation from which a jury could find that plaintiff had carried his burden of proving the requisite motive.  Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (citations omitted). A prisoner does not automatically cast doubt upon an institutional decision, nor is the decision "subject to exhaustive challenge," solely because he was engaged in a First Amendment right.  Adams v. James, 784 F.2d 1077, 1082 (11th Cir. 1986); Adams v. James, 797 F.Supp. 940, 949 (M.D.Fla. 1992).  Even though prison officials do not have the authority to prohibit inmates from filing grievances, it does not follow that every time an inmate files a grievance the act of doing so renders the exercise of prison authority suspect.  See Adams, 784 F.2d at 1082.  Courts should approach prisoner claims of retaliation "with skepticism and particular care" due to the "near inevitability" that prisoners will take exception with the decisions of prison officials and "the ease with which claims of retaliation may be fabricated."  Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), impliedly overruled in part on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

Here, Plaintiff merely asserts that legitimate acts of discipline toawrds him, a disruptive and belligerent inmate, were retaliatory in nature.  The DRs given to Plaintiff and the chemical spraying in question were not illegal retaliation, but were valid responses to violations of prison rules and concerns about prison security.

Furthermore, the officers who issued the DRs and utilized chemical agents against Plaintiff had no knowledge of the grievances written against Officer Burt.  Plaintiff has not brought forth affirmative evidence of retaliation from which a jury could find that Plaintiff has carried his high burden of proving the requisite motive.[9] Accordingly, the Defendants' motion should be granted.

## II.    Plaintiff has not stated an Eighth Amendment violation.

The use of mace or pepper spray is an accepted non-lethal means of controlling unruly inmates.  Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) (citing Jones v. Shields, 207 F.3d 491, 496 (8th Cir.2000) (citing cases); cf. Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir.2002)).  The use of chemical agents such as pepper spray or mace is evaluated just like any other kind of force. McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1244-45 (11th Cir. 2003). Courts have determined that the use of mace, tear gas, or other similar chemical agents does not constitute cruel and unusual punishment when reasonably necessary to subdue a "recalcitrant prisoner," even where the prisoner is locked in his cell or is handcuffed.  See, e.g., Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984) (citing cases); Jones v. Shields, 207 F.3d 491, 495-96 (8th Cir. 2000) (citing cases); Baldwin v. Stalder, 137 F.3d 836, 841 (5th Cir.1998).

---

[9] As stated by the Supreme Court, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

The evidence shows that the utilization of chemical agents on Plaintiff was not a violation of the Eighth Amendment.  On the night of October 21-22, 2008, Plaintiff was the paradigm of a "recalcitrant inmate."  (Exh's C: 9-10, L, M, N, R, S, T)  Accordingly, the use of chemical agents on Plaintiff did not violate the Eighth Amendment.  See Fischer v. Ellegood, 238 Fed. App'x 428 (11th Cir. 2007) (affirming summary judgment where plaintiff failed to mention any injury, and there was no evidence of sadistic or malicious intent in application of mace during a "shakedown") (Exh. DD).[10]

Additionally, being given a management meal is not a violation of the Eight Amendment.  See Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985); Novak v. Beto, 453 F.2d 661, 665, 668 (5th Cir. 1971) (stating that no Eighth Amendment violation occurred when a prisoner in solitary confinement was fed 2 slices of bread per day, unlimited water, and a full meal every 3 days, and that the restrictive diet did not extend beyond 15 days).  Plaintiff's allegation is frivolous and he should be given a "strike" for bringing it in his complaint.  Also, Plaintiff often refused the management meal.  (Exh. C: 11)

---

[10] Plaintiff's cell, as the evidence shows, was decontaminated.  Assuming, *arguendo*, that his cell was not adequately decontaminated, there is no evidence Defendants knew this.  Plaintiff admits that he did not tell anyone that the cell was inadequately decontaminated.  Thus, even if the cell was inadequately decontaminated, there is no evidence of malicious intent as Plaintiff failed to tell anyone of the condition of his cell.  For approximately thirty minutes before he was taken back to his decontaminated cell, Plaintiff was being examined at medical and taking a shower at a separate shower cell.  Conclusory statements from Plaintiff regarding this thirty minute time period may be ignored. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).

**III.    Plaintiff cannot recover compensatory or punitive damages.**

Any request by Plaintiff for compensatory or punitive damages is precluded by 42 U.S.C. § 1997e(e) if he cannot demonstrate physical injury.  42 U.S.C. § 1997e(e), as enacted by the Prison Litigation Reform Act, provides "no action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."  Plaintiff has not shown a physical injury.  (Exh. Q)[11]  As such, Plaintiff's request for compensatory and punitive damages is improper.  Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) (stating that § 1997e(e) precludes an inmate's claims for compensatory and punitive damages without a prior showing of physical injury).

**CONCLUSION**

In accordance with the aforementioned facts and case law, Defendants request that summary judgment be granted in their favor.  Additionally, Defendants

---

[11] Plaintiff admits that he did not seek medical attention in his Fourth Amended Complaint. (Doc. 78: 10)  Plaintiff asserts that he did not seek medical attention due to his fear of retaliation. (Id.)  However, Plaintiff wrote numerous grievances before and after October 22, 2008, demonstrating he had no fear of using the administrative channels available to him. (Exh's E, F, U) Furthermore, Plaintiff's alleged suffering due to lingering chemicals was not mentioned in Plaintiff's earlier iterations of his complaint.  (Doc's 1, 9, 12, and 16)  Conveniently, Plaintiff asserted his allegation of lingering chemicals after Defendants' filed their Motion to Dismiss Plaintiff's request for damages.  (Doc. 52)  Plaintiff is using the allegations about lingering chemical agents as a ploy to keep his request for damages viable.  As the three federal reports state, OC naturally dissipates and requires no special decontamination procedure.  (Exh. Y) Also, Plaintiff's cell was decontaminated as the prison records indicate.  (Exh's L, M, N, X: answer to question twelve)  Plaintiff can offer no proof whatsoever of any injury to him from the October 22, 2008 use of chemical agents.  As such, his request for damages must be dismissed. Furthermore, sanctions against Plaintiff should be recommended by this Court as Plaintiff has made allegations incompatible with the scientific evidence concerning OC in an effort to save his request for damages.

request Plaintiff be given a "strike" under 28 U.S.C. § 1915(e)(2)(B) and sanctions recommended against him under section 944.279, Florida Statutes, for filing a frivolous, false, and/or malicious claim.

Respectfully submitted,

**BILL MCCOLLUM
ATTORNEY GENERAL**

/s/ Lance Eric Neff
LANCE ERIC NEFF
Assistant Attorney General
Florida Bar Number 26626
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300 - Telephone
(850) 488-4872 - Facsimile
Email: Lance.Neff@myfloridalegal.com

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to: Robert Kornagay, DC# J13805, Santa Rosa C.I., 5850 East Milton Road, Milton, Florida, 32583-7914 on this 27th day of July, 2010.

/s/ Lance Eric Neff
LANCE ERIC NEFF