IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


ROBERT D. KORNAGAY,
     Plaintiff,

vs.                                   Case No. 3:09cv281/LAC/EMT

OFFICER BURT, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

       Plaintiff Robert D. Kornagay ("Kornagay") proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983. Presently before the court is the Motion for Summary Judgment filed by Defendants (Doc. 83). Kornagay filed a Response in opposition to the motion (Doc. 116). As set forth below, the court recommends that Defendants' Motion for Summary Judgment be granted in part.

I.      BACKGROUND

       Kornagay, an inmate of the Florida Department of Corrections ("FDOC"), initiated this action by filing a civil rights complaint on June 28, 2009 (Doc. 1). The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive motions. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b). In the Fourth Amended Complaint (Doc. 78), which is the operative pleading in this case, Kornagay names seven Defendants, all of whom were prison officials at Santa Rosa Correctional Institution ("SRCI") at the time of the events giving rise to this action: Officer Burt, Officer Covan, Officer Engstrom, Officer Grace, Sergeant Raybon, Lieutenant

Gielow, and Lieutenant Orsa (*id.* at 1–3).[1]  He contends Defendants retaliated against him for filing administrative grievances, in violation of the First Amendment, by:  1) writing false disciplinary reports, 2) spraying him with chemical agent, and 3) destroying his personal mail (*id.* at 6–12, 14). He additionally alleges Defendants Raybon, Gielow, and Orsa engaged in acts of excessive force, in violation of the Eighth Amendment, by: 1) spraying him with chemical agent, 2) placing him in a cell which was not properly decontaminated, and 3) maintaining him on the "management meal" without justification (*id.*).  Kornagay also claims that Defendants conspired to deprive him of his First Amendment rights (*id.* at 12).  As relief, Kornagay seeks a declaratory judgment and compensatory, punitive, and nominal damages (*id.* at 12, 14).[2]

Defendants filed their motion for summary judgment on July 27, 2010 (Doc. 83).  The court issued an advisement order informing the parties of the importance and ramifications of summary judgment consideration and providing them with information as to the requirements for materials submitted for Rule 56 review (Doc. 84).  Kornagay was given thirty days to respond to Defendants' motion (*id.*).  Kornagay sought, and the court granted, additional time to conduct discovery and file a response to the motion for summary judgment (*see* Docs. 85, 89, 91, 93, 96, 104, 106).  Kornagay filed his response in opposition to the motion for summary judgment on November 8, 2010 (*see* Docs. 114, 115, 116).

II.    MATERIAL FACTS

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Kornagay, the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).  The court conveys only those facts that are material.

---

[1] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

[2] Kornagay does not state whether Defendants are sued in thier individual or official capacities; the undersigned will therefore address Plaintiff's claims as if Defendants are sued in both capacities.

Case No.:  3:09cv281/LAC/EMT

Additionally, any facts included in Defendants' statement of undisputed material facts that are not controverted by Kornagay's statement of facts are deemed admitted. *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party).

Finally, with regard to the factual positions asserted by the parties, the court applies the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendants' motion and supporting materials—including the facts considered undisputed—show that Defendants are entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).  Applying these standards, the court conveys the following as the material facts.

Since Kornagay's receipt into FDOC custody in 2003, he has been convicted of several disciplinary violations, including fighting, disobeying regulations and orders, unarmed assault, lying to staff, and spoken threats (Doc. 83, Statement of Material and Genuine Facts ¶ 1; *see also* Ex. A). On September 29, 2008, a disciplinary report was written against Kornagay for Lying to Staff (Doc.

83, Statement of Material and Genuine Facts ¶ 3, Ex. D; *see also* Doc. 116, Ex. G, Declaration of Robert D. Kornagay ¶ 2). Kornagay was found guilty and placed in disciplinary confinement for sixty days (Doc. 83, Statement of Material and Genuine Facts ¶ 3, Ex. D). Kornagay does not dispute that he was guilty of this infraction (Doc. 116, Ex. G, Kornagay Decl. ¶ 2).

During September and October of 2008, Kornagay filed grievances against Defendant Burt (Doc. 83, Ex. B, Affidavit of Joshua Burt ¶¶ 2, 9–10). Due to the numerous grievances filed by Kornagay against Defendant Burt, Burt attempted to limit his interaction with Kornagay (Doc. 83, Statement of Material and Genuine Facts ¶ 2, Ex. B, Burt Aff. ¶ 8). On October 5, 2008, Kornagay filed an informal grievance against Burt, alleging that Burt told him he could not talk to or sit next to certain inmates (Doc. 83, Statement of Material and Genuine Facts ¶ 4, Ex. E, p. 1; Doc. 116, Ex. G, Kornagay Decl. ¶ 1). On October 9, 2008, Burt denied Kornagay's October 5 grievance (*see* Doc. 83, Ex. E, p. 1; Doc. 116, Ex. G, Kornagay Decl. ¶ 1). On October 10, 2008, Burt gave Kornagay an unsatisfactory mark on his daily record of special housing for allegedly yelling on the wing and arguing with staff, allegations which Kornagay denies (*see* Doc. 83, Statement of Material and Genuine Facts ¶ 6, Ex. C, p. 5; Doc. 116, Ex. G, Kornagay Decl. ¶ 4). Prior to October 10, 2008, Burt did not "write up" Kornagay for any type of aggressive, violent, disrespectful, or threatening conduct (Doc. 116, Ex. W, Burt's Answers to Plaintiff's Second Set of Interrogatories #2).

On October 11, 2008, Defendant Covan wrote Kornagay a disciplinary report for Spoken Threats (Doc. 83, Statement of Material and Genuine Facts ¶ 7, Ex. G, Ex. W, Affidavit of Matthew Covan ¶¶ 5–6). Kornagay denied the allegations, but the disciplinary team found him guilty and placed him In disciplinary confinement for thirty days (Doc. 83, Ex. G). Additionally, Kornagay's phone, visitation, dayroom, exercise, and out-of-cell educational programs privileges were suspended (Doc. 83, Ex. G, Ex. Z, p. 1). During the seven-month period prior to this disciplinary report, while Covan was assigned to Kornagay's dormitory, Covan had not issued Kornagay a disciplinary report or observed Kornagay engage in disruptive, aggressive, violent, disrespectful, or threatening conduct (Doc. 116, Ex. L, Covan's Answers to Plaintiff's Second Set of Interrogatories #3, Ex. M, Covan's Answers to Plaintiff's First Set of Interrogatories #16).

On October 12, 2008, Kornagay filed an informal grievance against Burt, alleging that Burt was threatening and harassing him for filing grievances against him (Doc. 83, Ex. E, p. 7). Defendant Gielow denied the grievance on the ground that he interviewed Burt, and Burt denied the allegations (*id.*). On October 15, 2008, Kornagay filed another informal grievance alleging that Burt was still harassing and threatening him, and Burt and Covan had conspired to write a false disciplinary report on October 11 (Doc. 83, Ex. E, p. 8). Gielow again denied the grievance on the ground that Burt denied Kornagay's allegations (*id.*). On October 16, 2008, Kornagay filed another informal grievance against Burt, alleging that Burt made racial slurs and a sexually harassing comment to him (Doc. 83, Ex. E, p. 9). Burt denied the allegations and denied the grievance (*id.*).

On October 16, 2008, Burt gave Kornagay an unsatisfactory mark on his daily housing record for allegedly yelling on the wing during count and improperly attempting to talk to other inmates while in the dayroom, allegations which Kornagay denies (Doc. 83, Statement of Material and Genuine Facts ¶ 8, Ex. C, p. 7; Doc. 116, Ex. G, Kornagay Decl. ¶ 4).

On October 17, 2008, Kornagay filed an informal grievance against Burt for allegedly interfering with his mail (Doc. 116, Ex. X). Also that day, Defendant Engstrom wrote Kornagay a disciplinary report for Spoken Threats (Doc. 83, Statement of Material and Genuine Facts ¶ 9, Ex. H, Affidavit of Joel Engstrom ¶¶ 5–6, 8, Ex. I). Kornagay denied the allegations, but the disciplinary team found him guilty and placed him in disciplinary confinement for thirty days (Doc. 83, Ex. I). Prior to issuing the disciplinary report, Engstrom had not issued Kornagay a disciplinary report for other incidents of bad conduct; however, Engstrom states Kornagay threatened him with physical harm on numerous occasions, and on one particular occasion, Kornagay called Engstrom to his cell only to pass gas on him (Doc. 83, Ex. H, Engstrom Aff. ¶ 7; Doc. 116, Ex. U, Engstrom's Answers to Plaintiff's Second Set of Interrogatories ## 1–2).

On October 18, 2008, Burt gave Kornagay an unsatisfactory mark on his daily housing record for allegedly yelling on the wing, an allegation which Kornagay denies (Doc. 83, Statement of Material and Genuine Facts ¶ 10, Ex. C, pp. 7–8; Doc. 116, Ex. G, Kornagay Decl. ¶ 4).

On October 21, 2008, Burt denied Kornagay's October 17 grievance accusing him of interfering with his mail (Doc. 116, Ex. X). Also on October 21, at 6:18 p.m., Burt gave Kornagay an unsatisfactory mark on his daily housing record for allegedly raising his middle finger at

Defendant Burt in a "f__k you" gesture and then pointing to his pen and making a throat-slitting gesture with his finger while Burt was supervising the dayroom, allegations which Kornagay denies (Doc. 83, Statement of Material and Genuine Facts ¶ 11, Ex. B, Burt Aff. ¶ 8, Ex. C, pp. 9–10; Doc. 116, Ex. G, Kornagay Decl. ¶ 4). At 7:00 p.m., Kornagay received another unsatisfactory mark for allegedly improperly attempting to communicate with other inmates in the dayroom, an allegation which Kornagay denies (Doc. 83, Statement of Material and Genuine Facts ¶ 12, Ex. C, p. 9; Doc. 116, Ex. G, Kornagay Decl. ¶ 4).

Later that evening, at 9:40 p.m., Defendant Grace wrote a disciplinary report against Kornagay for Assault or Attempted Assault on a Correctional Officer (Doc. 83, Statement of Material and Genuine Facts ¶ 13, Ex. J, Ex. V, Affidavit of Christopher Grace ¶¶ 5–7). Kornagay denied the allegations, but the disciplinary team found him guilty of the disciplinary infraction and placed him in disciplinary confinement for sixty days (*id.*). As an additional punishment, Captain A. Jackson, who is not a Defendant in this action, recommended that Kornagay be placed on the "Special Management Meal," be placed on "Heightened Security" status, and be required to wear a "Special Management Spit Shield," for the safety of staff (Doc, 83, Ex. J). The recommendations were approved by the Correctional Officer Chief, and Kornagay received the management meal for seven days and was required to wear a "spit shield" for six months (*see id.*; *see also* Doc. 78 at 8, ¶ 21). At 10:50 p.m., Defendant Grace wrote Kornagay a disciplinary report for Battery or Attempted Battery on a Correctional Officer (Doc. 83, Statement of Material and Genuine Facts ¶ 15, Ex. K). Kornagay denied the allegations, but the disciplinary team found him guilty of the disciplinary infraction and placed him in disciplinary confinement for sixty days (*id.*). At 11:00 p.m. and 11:05 p.m., Defendants Raybon and Orsa, respectively, counseled Kornagay to stop creating a disturbance by kicking his cell door (Doc. 83, Statement of Material and Genuine Facts ¶ 16, Ex. L, Affidavit of Gregory Raybon ¶ 4). Kornagay denies creating a disturbance on the wing (Doc. 116, Kornagay Decl. ¶ 4).

One hour later, at 12:00 a.m. on October 22, 2008, Raybon responded to Kornagay's cell regarding an alleged disturbance, namely, Kornagay's kicking his cell door and yelling obscenities (Doc. 83, Statement of Material and Genuine Facts ¶ 17, Ex. L, Raybon Aff. ¶ 5). Raybon counseled Kornagay and ordered him to cease (*id.*). At 12:08 a.m., Raybon again counseled Kornagay at his

cell-front and ordered him to cease (Doc. 83, Statement of Material and Genuine Facts ¶ 17, Ex. L, Raybon Aff. ¶ 6).  Kornagay denies he engaged in disruptive behavior (Doc. 116, Kornagay Decl. ¶ 4).

At 12:14 a.m., Raybon contacted Orsa and informed him of his attempts to counsel with Kornagay (Doc. 83, Statement of Material and Genuine Facts ¶ 18, Ex. L, Raybon Aff. ¶ 7, Ex. M, Affidavit of Patrick Orsa ¶ 4).  At 12:26 a.m., Raybon and Orsa counseled Kornagay at his cell-front and ordered him to cease (Doc. 83, Statement of Material and Genuine Facts ¶ 19, Ex. L, Raybon Aff. ¶ 8, Ex. M, Orsa Aff. ¶ 5).  At 12:29 a.m., Orsa reviewed Kornagay's Chemical Agent Risk Assessment Form, which stated that based upon a review of the medical records at the time of his pre-confinement health appraisal, Kornagay had no known medical condition that may be exacerbated by the use of chemical restraint agent (Doc. 83, Statement of Material and Genuine Facts ¶ 20, Ex. M, Orsa Aff. ¶ 6).  At 12:30 a.m., Orsa contacted Senior Registered Nurse S. Derrick, who stated that Kornagay had no known medical condition that may be exacerbated by the use of chemical restraint agent  (Doc. 83, Statement of Material and Genuine Facts ¶ 21, Ex. M, Orsa Aff. ¶ 7).  At 12:34 a.m., Orsa contacted Warden Ellis, who authorized Orsa to use chemical agent, if necessary, to quell Kornagay's alleged disturbance in the dormitory (Doc. 83, Statement of Material and Genuine Facts ¶ 22, Ex. M, Orsa Aff. ¶ 8).  At 12:35 a.m., Officer Klein, who is not a Defendant in this action, retrieved a video recorder and began recording procedures for a possible chemical agent use of force on Kornagay (Doc. 83, Statement of Material and Genuine Facts ¶ 23, Ex. M, Orsa Aff. ¶ 9).  At approximately 12:37 a.m., Orsa conducted a brief lead-in statement, introduced the staff involved and their attempts to quell the alleged disturbance (Doc. 83, Statement of Material and Genuine Facts ¶ 24, Ex. M, Orsa Aff. ¶ 10).  At 12:38 a.m., Orsa, Captain Shroyer, and Officer Klein (Shroyer and Klein are not Defendants) entered Kornagay's dormitory wing (Doc. 83, Statement of Material and Genuine Facts ¶ 25, Ex. M, Orsa Aff. ¶ 11; *see also* Ex. T, Affidavit of David Shroyer ¶ 3–5).  At 12:39 a.m., Orsa approached Kornagay's cell, counseled with him, and issued him a final order to cease disruptive behavior (*id.*).  Orsa informed Kornagay that if he did not stop causing a disturbance, Orsa would utilize chemical agent, and Kornagay complied (as previously noted, according to Kornagay, he was not creating a disturbance in the first place) (Doc. 83, Statement of Material and Genuine Facts ¶ 26, Ex. M, Orsa Aff. ¶ 11; *see also* Ex. T, Shroyer

Aff. ¶ 3). Orsa further informed Kornagay that if he engaged in disorderly behavior after Orsa and the other officers left the area, the final order would not be repeated prior to the application of chemical agent (*id.*). At 12:47 a.m., Orsa conducted a brief closing statement and the video recording ceased (Doc. 83, Statement of Material and Genuine Facts ¶ 27, Ex. M, Orsa Aff. ¶ 13).

Approximately twenty minutes later, at 1:11 a.m., Raybon informed Orsa that Kornagay was kicking his cell door and yelling obscenities in the wing (Doc. 83, Statement of Material and Genuine Facts ¶ 28, Ex. M, Orsa Aff. ¶ 14; Ex. L, Raybon Aff. ¶ 17). At 1:13 a.m., Orsa withdrew and weighed chemical agent OC Sabre Red OC MK-9 HVF canister number 104, serial number 1193293, from the D-dormitory secure storage area (Doc. 83, Statement of Material and Genuine Facts ¶ 29, Ex. M, Orsa Aff. ¶ 15, Ex. L, Raybon Aff. ¶ 18). At 1:15 a.m., Raybon, by order of Orsa, administered three one-second bursts of chemical agent through the opened handcuffing portal of Kornagay's cell (*id.*). A total of 109 grams of chemical agent was administered (*id.*). Gielow was not working the shift during which the chemical agent was administered (Doc. 83, Ex. L, Raybon Aff. ¶ 23, Ex. O, Affidavit of Walter Gielow ¶ 5). Raybon and Orsa's administration of the chemical agent was accomplished in accordance with FDOC procedures (Doc. 83, Statement of Material and Genuine Facts ¶ 33, Ex. M, Orsa Aff. ¶ 19, Ex. S, Affidavit of Douglas Harris ¶¶ 3, 5, Ex. T, Shroyer Aff. ¶¶ 3, 5).

At 1:23 a.m., Raybon placed Kornagay in wrist restraints and Lieutenant Harris and Officer W. Hopkins escorted Kornagay to cool water decontamination cell D2125, where he was permitted to shower (Doc. 83, Ex. M, Orsa Aff. ¶ 16; Doc. 116, Ex. G, Kornagay Decl. ¶ 6). Kornagay was issued clean boxer shorts and given a post-use-of-force examination by medical staff (Doc. 83, Statement of Material and Genuine Facts ¶ 30, Ex. L, Raybon Aff. ¶ 19, Ex. M, Orsa Aff. ¶ 17, Ex. Q at 6). Kornagay's medical records show that he reported a burning sensation on his skin, but staff observed no redness to his skin or other injuries (Doc. 83, Statement of Material and Genuine Facts ¶ 30, Ex. Q, pp. 24–25). Medial staff instructed Kornagay to take cold water showers only, and not to apply any lotion, cream, or soap to his skin (Doc. 83, Ex. Q at 24–25). During the examination, medical staff were not permitted to remove the "spit shield" that Kornagay was required to wear after he was convicted of Assault or Attempted Assault on Defendant Grace (Doc. 116, Kornagay

Decl. ¶ 6). Kornagay was returned to his original cell, D3115 (Doc. 83, Statement of Material and Genuine Facts ¶ 31, Ex. L, Raybon Aff. ¶ 20, Orsa Aff. ¶ 18; Doc. 116, Ex. G, Kornagay Decl. ¶ 7). According to Orsa and Raybon, the cell was decontaminated prior to Kornagay's return, meaning, the walls and fixed structures were washed with soapy water (Doc. 83, Statement of Material and Genuine Facts ¶¶ 31, 38, Ex. L, Raybon Aff. ¶ 20 , Ex. M, Orsa Aff. ¶ 18). Additionally, Kornagay was immediately issued a clean mattress, clothing, and property (*id.*). According to Kornagay, some chemical agent remained on the walls, floor, sink area, and both bunks. Additionally, although it is undisputed that Kornagay received clean bed linens, the parties dispute whether he received them immediately upon his return to his cell or two to three hours after the incident (*see* Doc. 83, Ex. L, Raybon Aff. ¶ 20 , Ex. M, Orsa Aff. ¶ 18; Doc. 116, Ex. G, Kornagay Decl. ¶¶ 7, 8). Kornagay states the next day he noticed "burn marks" on his head and back (Doc. 116, Ex. G, Kornagay Aff. ¶ 9).

At 4:00 a.m., Raybon issued Kornagay a disciplinary report for Participating in a Minor Disturbance (Doc. 83, Statement of Material and Genuine Facts ¶ 32, Ex. L, Raybon Aff. ¶ 22). Kornagay denied that he created a disturbance, but the disciplinary team found him guilty of the disciplinary infraction and placed him in disciplinary confinement for thirty days (Doc. 83, Statement of Material and Genuine Facts ¶ 32, Ex. L, Raybon Aff. ¶¶ 21–22, Ex. R; Doc. 116, Ex. G, Kornagay Decl. ¶ 4). Additionally, Kornagay's phone, visitation, dayroom, exercise, and out-of-cell educational programs privileges were suspended (Doc. 83, Ex. G, Ex. Z, p. 3).

On November 5, 2008, the institutional classification team ("ICT") recommended that Kornagay be placed on CMI, the most restrictive custody status, due to the disciplinary reports he received from Defendants Engstrom, Covan, Grace, and Raybon (Doc. 83, Statement of Material and Genuine Facts ¶ 40, Ex. Z, pp. 4, 13–14). The recommendation was approved on November 21, 2008 (*id.*).[3]

Oleoresin Capsicum ("OC") is an organic oily resin derived from the pepper plant (Doc. 83, Statement of Material and Genuine Facts ¶ 37, Ex. Y). In most cases, OC requires no special

---

[3] Kornagay was originally placed on close management ("CM") custody status, specifically, CMII, on February 13, 2008 (Doc. 83, Ex. Z, pp. 4, 7–8). On August 6, 2008, he was placed on CMIII, the least restrictive close management status (*id.*, pp. 4, 9–10).

decontamination procedures (*id.*). OC is biodegradable and, unlike chemical irritants, does not linger in clothing or affected areas (*id.*). Also, unlike chemical irritants which are pain inducers and tearing agents, OC causes an incapacitating inflammatory response (*id.*). The primary effects of exposure to OC are pain and irritation of the mucous membranes of the eyes, nose, and lining of the mouth (*id.*). OC vapors cause pulmonary irritation and prolonged coughing (*id.*). After a subject is sprayed with OC, an officer only needs to provide water for flushing eyes and skin, as well as proper ventilation (*id.*). No long term effects are known to be caused by OC (*id.*).

Throughout the months of October and November of 2008, Kornagay continued to file grievances (Doc. 83, Statement of Material and Genuine Facts ¶ 34, Exs. E, F, U).

III.     LEGAL STANDARDS

A.     Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Kornagay has no evidence to support his case or present affirmative evidence that Kornagay will be unable to prove his case at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of Kornagay's case, the burden shifts to Kornagay to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Kornagay must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. Kornagay must either point to evidence in the

record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Kornagay in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Kornagay still bears the burden of coming forward with sufficient evidence of every element that he must prove. Celotex Corp., 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.    First Amendment Retaliation Standard

It is well established that the First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. *See* Crawford-El v Britton, 523 U.S. 574, 588 n.10, 592–93, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted); Adams v. James, 784 F.2d 1077, 1080 (11th Cir. 1986) (citation omitted); *see also* Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986). "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment." Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006). To prevail on a claim of retaliation, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See* Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008) (citing Bennett v. Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)); Cummings v. Harrison, 695 F. Supp. 2d 1263, 1274–75 (N.D. Fla. 2010). A prisoner's filing of a grievance concerning the conditions of his

imprisonment is protected speech under the First Amendment. *See* Douglas, 535 F.3d at 1321 (quoting Boxer X, 437 F.3d at 1112). As to the second element, the Eleventh Circuit employs a purely objective standard: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 423 F.3d at 1253. In adopting this objective standard, the Eleventh Circuit expressly rejected a subjective "actual chill" standard, that is, a plaintiff suffers adverse action only if the retaliatory conduct actually chilled the exercise of his First Amendment rights. *Id.* at 1250–54. The third element, whether there was a causal connection between the retaliatory acts and the adverse effect on the speech, "asks whether the defendants were subjectively motivated to discipline because [the prisoner] complained of the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008).

The Supreme Court decisions of Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) and Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) guide analysis of a First Amendment retaliation claim. *See* Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695, 64 L. Ed. 2d 441 (2006) (citing Mt. Healthy, 429 U.S. at 287; Pickering, 391 U.S. at 566–67); Cummings, 695 F. Supp. 2d at 1274; Pate v. Peel, 256 F. Supp. 2d 1326, 1339 (N.D. Fla. 2003). Although the framework was established in the employment context, it is beneficial to maintain uniformity in these types of cases. Cummings, 695 F. Supp. 2d at 1274–75. The employment four-step analysis is reduced to a three-step analytical framework, but continues to provide a workable standard to guide all retaliation cases. *Id.* at 1275. Initially, the plaintiff must plead and provide sufficient evidence of the retaliatory motive and the adverse action. *See* Hartman, 547 U.S. at 259–60. "[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ." *Id.* at 260 (citing Mt. Healthy, 429 U.S. at 287). In the context of a defendant's motion for summary judgment, however, the plaintiff has the ultimate burden of proof; therefore, the defendant need only point to evidence as to the legitimate reason, and the plaintiff must produce "affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El, 523 U.S. at 600 (citing Liberty Lobby, Inc., 477 U.S. at 256–57). "The relevant showing . . . must be

more than the prisoner's 'personal belief that he is the victim of retaliation.'" Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (quoting Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995)). Appropriate deference should be afforded to prison officials "in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (citing Sandin v. Conner, 115 S. Ct. 2293, 2299 (1995)). And, because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598 (citation omitted); Harris v. Ostrout, 65 F.3d 912, 916–17 (11th Cir. 1995); see also Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (because claims of retaliation may be easily fabricated, they should be reviewed with skepticism). To defeat a summary judgment motion, a plaintiff need not adduce clear and convincing evidence of improper motive, but he must produce evidence from which a jury could find by a preponderance of the evidence, that retaliation was the but-for cause of the challenged action. See Crawford-El, 523 U.S. at 590–95, 600. "If there is a finding that retaliation was not the but-for cause of the action complained of, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." Hartman, 547 U.S. at 260 (citing Mt. Healthy, 429 U.S. at 287); see also Crawford-El, 523 U.S. at 593. Indeed, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Hartman, supra (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 285–86). However, "when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution." Hartman, 547 U.S. at 256 (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 283–84).

      C.    Eighth Amendment Standard — Excessive Force

      Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment. The standard applied to Eighth Amendment claims has a subjective and an objective component. As to the objective component, "not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (citing Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). "The

Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, *supra* (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Id.* (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320–21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." Hudson, 503 U.S. at 7–8; *see also* Whitley, 475 U.S. at 321; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321 (quoting Johnson, 481 F.2d at 1033). Although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not whether a quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm. *See* Wilkins v. Gaddy, 130 S. Ct. 1175, 1178–79, 2010 WL 596513, *2–3 (U.S. February 22, 2010); *see also* Hudson, 503 U.S. at 4. Additionally, under Eleventh Circuit law, in cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force. Skrtich, 280 F.3d. at 1302.

That officials followed prison regulations in administering force or restraint provides evidence that they acted in good faith and not to inflict pain.  Campbell, 169 F.3d at 1376 (citation omitted).  Thus, as summarized in Campbell, "[p]recedent dictates that [the determination whether defendants acted maliciously and sadistically for the very purpose of causing harm] be guided by the five Hudson/Whitley factors outlined above, by deference to prison officials' punitive judgments, and by this Court's previous holdings that compliance with prison policies evidences officials' good faith." *Id.*

The Court in Whitley narrowed the precise inquiry applicable when deciding whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.  Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Whitley, 475 U.S. at 322 (emphasis added).

D.      Eleventh Amendment Immunity

The Eleventh Amendment is an absolute bar to suits for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); Edelman v. Jordan, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355–56, 39 L. Ed. 2d 662 (1974).  Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit against a state in federal court.  Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  Florida has not waived its sovereign immunity or consented to be sued in damage suits brought pursuant to § 1983.  *See* Gamble v. Fla. Dep't of Health & Rehabilitative Servs., 779 F.2d 1509, 1513 (11th Cir. 1986); Fla. Stat. § 768.28(17).  Furthermore, Congress did not intend to abrogate a state's Eleventh Amendment immunity in § 1983 damage suits.  *See* Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490 (11th Cir. 1995).

E.      Monetary Damages for Mental or Emotional Injury

In an action pursuant to 42 U.S.C. § 1983, a plaintiff may recover damages for monetary loss, physical pain and suffering, mental and emotional distress, impairment of reputation, and

personal humiliation.  <u>Slicker v. Jackson</u>, 215 F.3d 1225, 1231 (11th Cir. 2000).  However, under 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Thus, pursuant to § 1997e(e), a prisoner bringing a § 1983 action must demonstrate a physical injury that is more than de minimis in order to recover compensatory and punitive damages for mental or emotional injury suffered while in custody.  *See* <u>Harris v. Garner</u>, 190 F.3d 1279, 1286–87 (11th Cir. 1999), *reh'g en banc granted*, *opinion vacated*, 197 F.3d 1059 (11th Cir. 1999), *reinstated in relevant part on reh'g*, 216 F.3d 970 (11th Cir. 2000) (forced "dry shave" only amounted to a de minimis injury); *see also* <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1258 n. 4 (11th Cir. 2000) (bruises received during an arrest were non-actionable de minimis injury).[4]

## IV.    DISCUSSION

In Defendants' motion for summary judgment, they do not dispute that Kornagay's filing administrative grievances was protected activity under the First Amendment, thereby satisfying the first element of the retaliation standard (*see* Doc. 83 at 15).  They argue there is insufficient evidence from which a reasonable jury could find that Kornagay satisfied the second prong of the First Amendment standard, that is, that he suffered adverse action such that the prison official's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech (*id.* at 15–19).  Defendants additionally argue that there is insufficient evidence from which a

---

[4] In <u>Harris</u>, the court left open the question whether, upon a prisoner's showing that he or she had suffered the violation of some absolute constitutional right, the prisoner may be entitled to nominal damages (in addition to declaratory or injunctive relief or both) for redress of the constitutional tort even in the absence of physical injury. Several other circuits have reached the question regarding availability of nominal damages, and have held that [apart from any unavailability of punitive and/or compensatory damages resulting from the statutory language of § 1997e(e)] prisoner plaintiffs may sue on constitutional claims and if they prevail may at least recover nominal damages.  *See* <u>Thompson v. Carter</u>, 284 F.3d 411, 418 (2d Cir. 2002) (declaratory and injunctive relief, and nominal damages not barred); <u>Searles v. Van Bebber</u>, 251 F.3d 869, 878–80 (10th Cir. 2001) (compensatory damages barred, but nominal damages and punitive damages are not); <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 251–52 (3d Cir. 2000) (compensatory damages are barred, but nominal and punitive damages are recoverable); <u>Rowe v. Shake</u>, 196 F.3d 778, 781–82 (7th Cir. 1999) (declaratory and injunctive relief, and nominal damages not barred).

reasonable jury could find that Kornagay satisfied the third prong of the First Amendment standard, that is, a causal relationship between the retaliatory action and the protected speech (*id.*).

A.     Defendant Burt — First Amendment Retaliation Claim

Kornagay alleges in his complaint that Burt retaliated against him for grievances he filed on October 5, 12, 15, and 17 (Doc. 78 at 6).  Kornagay states that on October 10, 2008, Burt approached his cell and stated, "Payback is a mother f[_]ker.  My gang is stronger than yours; I'm down with the good ole boys and we will always win." (*id.*).  Kornagay states Burt then threatened to conspire with other correctional officers to write false disciplinary reports, have Kornagay sprayed with chemical agent, and have him upgraded to the most restrictive custody level (*id.*).  Kornagay additionally alleges Burt retaliated by destroying his personal mail on October 17 (*id.* at 7, 14).

Burt submitted an affidavit denying that he made the statements alleged by Kornagay (Doc. 83, Ex. B, Burt Aff. ¶ 3).  Additionally, he denies that he ever retaliated against Kornagay or asked any correctional officer to retaliate against him (Doc. 83, Ex. B, Burt Aff. ¶¶ 5–6, 11).  Burt states that during the months of September and October of 2008, Kornagay became increasingly belligerent and verbally antagonistic, and often yelled and cursed (*id.* ¶ 9).  Burt states his interactions with Kornagay in an attempt to get him to cease his disruptive behavior resulted in Kornagay's filing grievances against him (*id.*).  Burt further states that due to the grievances, he attempted to limit his interaction with Kornagay; nonetheless, Kornagay continuously tried to "bait" him into interacting with him (*id.*).  Burt states that on October 21, 2008, Kornagay raised his middle finger at him in a "f__k you" gesture while Burt was supervising the dayroom, and Kornagay then pointed to his pen and made a "throat slitting gesture" with his finger (*id.* ¶ 8).  Burt states Kornagay's actions led to his receiving an unsatisfactory mark on his daily housing record (*id.*).  Burt denies that he ever destroyed any of Kornagay's mail (*id.* ¶ 4).

Kornagay submitted copies of his daily housing records showing that Burt made six notations of unsatisfactory conduct on his record during the month of October (one on October 10, two on October16, one on October 18, and two on October 21) (*see* Doc. 116, Statement of Material and Genuine Facts ¶¶ 3, 8, 14, 16, Exs. I, P, Y).  According to FDOC policy, an inmate's daily record of special housing is reviewed by the institutional classification team (the team that  assesses

whether an inmate should be upgraded to a more restrictive custody status).  *See* Fla. Admin. Code r. 33-601.800(16), (17)(b).  Kornagay disputes that he engaged in the behavior that led to unsatisfactory marks (Doc. 116, Ex. G, Kornagay Decl. ¶ 4).

Additionally, Kornagay submitted the written deposition of Inmate Malcolm Hodges, who was housed in cell D-3111 at SRCI during the months of September and October of 2008 (Doc. 116, Ex. D, Hodges Dep. #1; Sept. 13, 2010).  Inmate Hodges states he "recalls seeing" Burt at Kornagay's cell door threatening to conspire with other correctional officers to write false disciplinary reports and have Kornagay sprayed with chemical agent to retaliate against him for writing grievances (Doc. 116, Ex. D, Hodges Dep. #3).  Inmate Donnie Adkins states he also observed this (Doc. 116, Ex. R-2, Donnie Adkins Dep. # 7, Oct. 20, 2010).  Kornagay additionally submitted the written deposition of Inmate Benson Frazier, who was housed in cell D-3116 at SRCI during the months of September and October of 2008 (Doc. 116, Ex. F, Frazier Dep. #1; Sept. 10, 2010).  Inmate Frazier states he heard Burt "threatening" Kornagay's "property" (Doc. 116, Ex. F, Frazier Dep. #3).  Inmate Edward Davis, Jr., states that between July and September of 2009 (after the instant lawsuit was filed), he heard Burt say, "I'm thinking about getting back on the 3 to 11 shift so I can trash some more of your mail" (Doc. 116, Ex. V, Declaration of Edward Davis, Jr.).

Viewing the evidence in the light most favorable to Kornagay, he has presented sufficient evidence to satisfy the second and third prongs of the First Amendment standard.[5]  Kornagay's daily housing records are sufficient to show a genuine issue of material fact as to whether he suffered adverse consequences.  Additionally, Kornagay's denial that he engaged in the conduct underlying the unsatisfactory marks, and the statements of Inmates Hodges and Adkins that they heard Burt threaten Kornagay with adverse action for filing grievances, are sufficient to create a reasonable inference that Kornagay's grievances were the but-for cause of Burt's actions.  Therefore, Defendant Burt is not entitled to summary judgment.

B.    Defendant Covan — First Amendment Retaliation Claim

---

[5] As noted *supra*, the first prong, that is, the requirement of constitutionally protected speech, is also satisfied. Douglas, 535 F.3d at 1321 (filing of a grievance regarding conditions of imprisonment is protected speech under the First Amendment).

Kornagay alleges that on October 10, 2008, Covan falsely claimed that he (Kornagay) threatened him, and Covan wrote a false disciplinary report in retaliation for Kornagay's filing grievances (Doc. 78 at 6, 14). Kornagay additionally alleges that on October 24, 2008, Covan stated, "Kornagay, you seem like a good kid, but I had no choice but to write you a case, if not everyone will start writing grievances on all the shit that goes on around here; we have to discourage that shit some kind of way." (*id.* at 11).

Covan submitted his own affidavit denying that he made the statements alleged by Kornagay (Doc. 83, Ex. W, Covan Aff. ¶ 4). Covan denies that he knew that Kornagay filed any grievances against Burt and denies that Burt asked him to retaliate against Kornagay (*id.* ¶ 3). Covan states he issued the disciplinary report against Kornagay on October 10, 2008, because Kornagay violated prison regulations, not in retaliation for writing grievances.[6]

Kornagay disputes that he engaged in the behavior that led to the disciplinary report (Doc. 116, Ex. G, Kornagay Decl. ¶ 4). Additionally, Kornagay submitted the written deposition of Inmate Benson Frazier (who, as noted *supra*, was housed in cell D-3116 at SRCI during the months of September and October of 2008), who states he never heard Kornagay threaten Covan (Doc. 83, Ex. F, Frasier Dep. ## 1, 7–9). Inmate Frazier also states he heard Covan comment about grievances that Kornagay filed against Burt (Doc. 116, Ex. F, Frasier Dep. # 6).

Viewing the evidence in the light most favorable to Kornagay, Kornagay has produced sufficient evidence from which a jury could find that he did not engage in the conduct underlying Covan's disciplinary report. He has also produced evidence from which a jury could find that Covan filed the disciplinary report because of Kornagay's writing grievances. Kornagay has thus come forward with sufficient evidence showing that he was subjected to adverse consequences, and the but-for cause of those consequences was his writing grievances. Therefore, Defendant Covan is not entitled to summary judgment.

C.      Defendant Engstrom — First Amendment Retaliation Claim

---

[6] Covan states Kornagay was yelling at his cellmate, and when Covan ordered him to stop yelling, Kornagay replied, "Shut the f[_]k up! Y'all always be f[__]king with me. I'm gonna kick your punk ass when I get the chance." (Doc. 83, Ex. W, Covan Aff. ¶¶ 5–6). Covan again ordered Kornagay to stop yelling, and Kornagay replied, "F[_]k yourself" and sat on his bed and refused to reply to Covan's attempts to counsel with him (*id.*)

Kornagay alleges in his complaint that on October 17, 2008, Engstrom threatened him and filed a false disciplinary report against him in retaliation for filing grievances (Doc. 78 at 7, 14). Kornagay additionally alleges that on October 24, 2008, Engstrom stated, "All you have to do is stop filing grievances and you won't have to worry about us writing you no more [sic] crazy DR's." (*id.* at 11).

Engstrom submitted his own affidavit denying that he made the statement alleged by Kornagay (Doc. 83, Ex. H, Engstrom Aff. ¶ 4). Engstrom denies that he knew that Kornagay filed any grievances against Burt and denies that Burt asked him to retaliate against Kornagay (*id.* ¶ 3). Engstrom states he issued the disciplinary report against Kornagay on October 17, 2008, because Kornagay violated the disciplinary rules, not in retaliation for Kornagay's filing grievances against Defendant Burt.[7]

Kornagay disputes that he engaged in the behavior that led to the disciplinary report (Doc. 116, Ex. G, Kornagay Decl. ¶ 4). Additionally, Kornagay submitted the written deposition of Inmate Benson Frazier, who states he was housed in the cell next to Kornagay's in September and October of 2008, and he never heard Kornagay threaten Engstrom (Doc. 116, Ex. F, Frasier Dep. ## 1, 7–9).

Viewing the facts in the light most favorable to Kornagay, he has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether he engaged in the conduct underlying the disciplinary report.[8] Additionally, he has presented sufficient evidence from which a jury could find that Engstrom told him he would not receive any more disciplinary reports if he stopped filing grievances. This evidence is sufficient to show that Kornagay was subjected to adverse action for filing grievances, and that retaliation was the but-for cause of Engstrom's disciplinary report. Therefore, Defendant Engstrom is not entitled to summary judgment.

---

[7] Engstrom states Kornagay was beating his desk in his cell and singing, "F[_]k the police," and when Engstrom ordered him to stop, Kornagay threatened him by stating,"The only way I'm gonna stop singing is if I get out of this cell and beat your country ass!" (Doc. 83, Ex. H, Engstrom Aff. ¶¶ 5–6, 8). Engstrom states he again ordered Kornagay to stop, and Kornagay responded, "You're lucky I'm feeling good, I'm gonna stop for now." (*id.*).

[8] Inmate Frazier's statement, standing alone, would likely be insufficient to demonstrate a genuine issue of material fact as to whether Kornagay threatened Engstrom (since Kornagay could have threatened Engstrom when Frazier was not in his cell or was otherwise incapable of hearing the threat). However, in light of the competing affidavits submitted by Kornagay and Engstrom, the undersigned concludes a genuine issue of material fact exists.

D.   Defendant Gielow — First Amendment Retaliation Claim and Eighth Amendment
     Cruel and Unusual Punishment Claims

Kornagay alleges Gielow denied some of the grievances he filed against Burt (Doc. 78 at 7).

Kornagay also alleges that on October 21, 2008, Gielow appeared at his cell, directed him to stop

filing grievances, and ordered him to write a statement stating that the grievances he filed against

Burt were based upon lies (*id.* at 7–8).   Kornagay additionally alleges Gielow ordered Raybon to

spray him with chemical agent in retaliation for filing grievances (*id.* at 12).   Kornagay claims this

conduct (ordering Raybon to spray him) violated the First and Eighth Amendments (*id.*).

Kornagay also claims that Gielow violated the Eighth Amendment by failing to conduct daily

visits while he was on the management meal to determine if he should be removed from it (*id.* at 11,

12).   He contends Gielow maliciously and sadistically kept him on the meal for seven days, which

resulted in significant weight loss, sleep deprivation, emotional pain, and mental anguish (*id.* at

8–9).

Gielow denies that he was ever asked by Defendant Burt to retaliate against Kornagay, and

he denies that he ever retaliated against him (Doc. 83, Ex. O, Gielow Aff. ¶ 3).   Gielow additionally

denies that he ordered Kornagay to stop filing grievances and write a statement that the grievances

he filed against Burt were false (*id.* ¶ 4).   Gielow denies he ordered Raybon to spray Kornagay with

chemical agent on October 21, 2008 (*id.* ¶ 5).   He states he worked the "administrative shift" (7:00

a.m. to 4:00 p.m.) on October 21, 2008 (and submitted documentation verifying this (*see* Doc. 83,

Ex. P)), whereas Raybon worked the "midnight shift" (11:00 p.m. to 7:00 a.m.) (*id.* ¶ 5).

Additionally, Raybon and Orsa state in their affidavits that Orsa, not Gielow, ordered Raybon to

administer the chemical agent, and the warden authorized it (Doc. 83, Ex. L, Raybon Aff. ¶¶ 18, 23,

Ex. M, Orsa Aff. ¶¶ 8, 15).

In response, Kornagay submitted the written deposition of Inmate Malcolm Hodges (who,

as previously noted, was housed in cell D-3111 at SRCI during the months of September and

October of 2008 (Doc. 116, Ex. D, Hodges Dep. #1)).   Inmate Hodges states he heard Gielow at

Kornagay's cell door threatening to have Kornagay sprayed with chemical agent if he did not write

a witness statement saying he submitted false grievances against Burt (*id.* #4).   Kornagay also

submitted the written deposition of Inmate Ramziddin Harris, who was housed in dormitory  D, cell

3213, at SRCI during the months of September, October, and November of 2008 (Doc. 116, Ex. Z, Harris Dep. #1, Sept. 22, 2010). Inmate Harris states "a day or so before [Kornagay] was sprayed," he heard Gielow attempting to force Kornagay to write a statement saying that the grievances he filed against Burt were false, and that if Kornagay proceeded with the grievances, he would be gassed (*id.* # 12). Additionally, Kornagay submitted a declaration from Inmate Kenneth Mills, who states he was housed in the cell above Kornagay's in January of 2010, and heard Gielow stop at Kornagay's cell and state, "Inmate Kornagay! I heard your name in the air the other day, so you still haven't learned about the grievance box. I hope I don't have to send them good old boys at you again. I hate to see a so called grown man cry twice in my life time." (Doc. 116, Ex. A-2, Declaration of Kenneth Mills, Jan. 14, 2010). Inmate Gregory Meeks attests he heard Gielow say essentially the same thing (Doc. 116, Ex. B-2, Declaration of Gregory Meeks, Jan. 17, 2010).

Although Kornagay has come forward with sufficient evidence showing that Gielow threatened to have him sprayed with chemical agent, he has failed to show a genuine issue of material fact as to whether Gielow actually participated in the decision to do so. Raybon and Orsa affirm that Orsa, not Gielow, ordered Raybon to administer chemical agent, and Kornagay has not presented sufficient evidence disputing this fact. Additionally, it is undisputed that Gielow was not working the shift during which Raybon was ordered to spray Kornagay. It is also undisputed that Gielow and Orsa were the same rank (lieutenant); therefore, Gielow had no more authority than Orsa to order or approve Raybon's application of chemical agent. Kornagay has not come forward with sufficient evidence to show a genuine issue of material fact as to whether he suffered adverse action attributable to Gielow. Therefore, Gielow is entitled to summary judgment on Kornagay's First and Eighth Amendment claims relating to the application of chemical agent.

With regard to Kornagay's Eighth Amendment claim that Gielow (and Defendant Raybon[9]) subjected him to cruel and unusual punishment by maintaining him on the management meal for seven days without any penological justification, Kornagay has failed to show a genuine issue of material fact as to whether Gielow or Raybon was responsible for this alleged punishment. The

---

[9] For simplicity, the undersigned includes in this discussion Plaintiff's identical claim against Defendant Raybon. Kornagay's remaining claims against Raybon are discussed in the next section of this Report.

record demonstrates that neither Gielow nor Raybon recommended or approved Kornagay's placement on the management meal; instead, Captain A. Jackson made the recommendation, and it was approved by the Correctional Officer Chief (Doc. 83, Ex. J). Additionally, even if Gielow or Raybon had a duty to conduct a daily visit to determine when Kornagay should be removed from the management meal,[10] there is no evidence to suggest that their failure to do so the result of wantonness instead of mere negligence. Therefore, Gielow and Raybon are entitled to summary judgment on this claim.

     E.     <u>Defendants Raybon and Orsa — First Amendment Retaliation Claims and Eighth Amendment Cruel and Unusual Punishment Claims</u>

Kornagay alleges that on October 22, 2008, Raybon and Orsa approached his cell, and Raybon stated, "Kornagay, you done went [sic] and pissed the lieutenant off with them [sic] grievances; now I got to spray up the place; I'll be back in a few so get ready." (Doc. 78 at 9). Kornagay alleges that an hour and a half later, Raybon claimed that he (Kornagay) was creating a disturbance and sprayed him with chemical agent, in retaliation for filing grievances (*id.*). Kornagay alleges Orsa participated in the use of chemical agent and knew that the action was taken to retaliate against him for filing grievances (*id.* at 10, 12). Kornagay alleges Raybon then filed a false disciplinary report as further retaliation (*id.* at 11, 14).

In addition to his First Amendment claim, Kornagay contends the unjustified use of chemical agent by Raybon and Orsa, as well as their returning him to a cell that was not sufficiently decontaminated, violated his Eighth Amendment rights (Doc. 78 at 12, 14).

Raybon submitted his own affidavit denying that he made the statement alleged by Kornagay (Doc. 83, Ex. L, Raybon Aff. ¶ 24). Raybon and Orsa both deny that they knew Kornagay filed a grievance against Burt (Doc. 83, Ex. L, Raybon Aff. ¶ 3, Ex. M, Orsa ¶ 3). Raybon and Orsa state the adverse action taken against Kornagay (the issuance of a disciplinary report on October 22 and spraying Kornagay with chemical agent) was motivated by Kornagay's infraction of disciplinary rules, and not in retaliation for his filing grievances against Defendant Burt (*id.*, Raybon Aff. ¶ 22,

---

[10] FDOC policy provides that the chief of security (or, in the chief's absence, the shift supervisor) and a designated clinical health care person shall visit each inmate on special management meal status on a daily basis to follow the inmate's progress and determine when the inmate should be removed from the management meal. *See* Fla. Admin. Code r. 33-602.223(7).

Orsa ¶ 20). Rayon and Orsa submitted affidavits of two correctional officers, Harris and Shroyer (neither of whom is a Defendant in this action), who both state they witnessed the events of October 22, 2008, related to the use of chemical agent on Kornagay (Doc. 83, Ex. S, Harris Aff. ¶ 3, Ex. T, Shroyer Aff. ¶ 3). Harris and Shroyer state Kornagay was creating a disturbance on the wing and failed to heed orders to cease his disruptive behavior (*id.*). They state the use of force on Kornagay was necessary for the security of the institution (*id.*, Ex. S, Harris Aff. ¶¶ 4, 5, Ex. T, Shroyer Aff. ¶¶ 4, 5). They also state the administration of chemical agent was accomplished in accordance with FDOC procedures (*id.* Ex. S, Harris Aff. ¶¶ 3, 5, Ex. T, Shroyer Aff. ¶¶ 3, 5).

Additionally, Raybon and Orsa attest that Kornagay's cell was decontaminated prior to his return, meaning, the walls and fixed structures were washed with soapy water (Doc. 83, Statement of Material and Genuine Facts ¶¶ 31, 38, Ex. L, Raybon Aff. ¶ 20 , Ex. M, Orsa Aff. ¶ 18). They further state Kornagay was immediately issued a clean mattress, linens, clothing, and property (*id.*, Raybon Aff. ¶ 20, Orsa Aff. ¶ 18). Additionally, Defendants submitted scientific evidence showing that in most cases OC requires no special decontamination procedures (Doc. 83, Ex. Y). OC is biodegradable and, unlike chemical irritants, does not linger in clothing or affected areas (*id.*). Also, unlike chemical irritants which are pain inducers and tearing agents, OC causes an incapacitating inflammatory response (*id.*). The primary effects of exposure to OC are pain and irritation of the mucous membranes of the eyes, nose, and lining of the mouth (*id.*). OC vapors cause pulmonary irritation and prolonged coughing (*id.*). After a subject is sprayed with OC, an officer only needs to provide water for flushing eyes and skin, as well as proper ventilation (*id.*).

Kornagay disputes that he engaged in the behavior that led to the application of chemical agent and the disciplinary report (Doc. 116, Ex. G, Kornagay Decl. ¶ 4). He submitted the written deposition of Inmate Malcolm Hodges, who states that prior to Kornagay's being sprayed with chemical agent, Kornagay was not yelling on the wing, kicking his cell door, or otherwise creating a disturbance (Doc. 116, Ex. D, Hodges Dep. #6). Hodges states that prior to Kornagay's being sprayed, Raybon told Kornagay that Kornagay angered Gielow with all the grievances he had filed and now he (Raybon) had to "spray the place up" with chemical agent (*id.*. ## 7–8). Additionally, Hodges states he heard Raybon and Orsa at Kornagay's cell door saying that he had to "wear a gasing [sic]" because he wrote grievances; and they told Kornagay to stop writing grievances or he

would be gassed again (*id.*). Kornagay also submitted the declaration of Inmate Donnie Adkins, who states that prior to Kornagay's being sprayed with chemical agent, Kornagay was not yelling on the wing, kicking his cell door, or otherwise creating a disturbance (Doc. 116, Ex. R-2, Adkins Dep. #3). Additionally, Kornagay submitted the declaration of Inmate Murray James, in which James states that on October 22, 2008, Raybon stated, "I had to gas your old cellmate, Kornagay, this morning, because he went and got on Gielow's bad side with all them [sic] damn grievances he like [sic] to write. You need to try and talk some since [sic] into that fool, because the more he write [sic] the more we spray." (Doc. 116, Ex. J-2, Declaration of Murray James, July 1, 2009).

Kornagay states in his affidavit that when he was returned to his cell, chemical agent remained on the walls, floor, sink, and beds (Doc. 116, Ex. G, Kornagay Decl. ¶ 7). He also states that although he immediately received a clean mattress, clothing, and property, he did not receive a clean blanket or bed linens until 3:30 a.m., two hours after the incident (*id.* ¶ 8, *see also* Ex. Y, p. 2). Kornagay states he asked Raybon and Orsa to move him to another cell because his cell was still contaminated, and he could not breathe, but they ignored his request (as they stood at his cell wearing face masks) and walked away joking about Kornagay's condition (Doc. 116, Ex. G ¶ 7). Additionally, Kornagay submitted the written deposition of Inmate Malcolm Hodges that Kornagay's cell was not cleaned after the use of chemical agent (Doc. 116, Ex. D, Hodges Dep. ## 9–10). Inmate Adkins states he observed chemical agent on the bed and walls of Kornagay's cell before Kornagay was returned to his cell (Doc. 116, Ex. R-2, Adkins Dep. # 5).

In light of the evidence presented by Kornagay, there is a genuine issue of material fact as to whether Raybon and Orsa had any penological justification for spraying Kornagay with chemical agent. The evidence, viewed in the light most favorable to Kornagay, supports a reliable inference that their use of force amounted to an unnecessary, unreasonable, and wanton infliction of pain. Additionally, Kornagay has presented evidence showing that he was sprayed and issued a disciplinary report as a means to punish him for filing grievances. In light of the evidence, there is a genuine issue of material fact as to whether retaliation was the but-for cause of Raybon and Orsa's use of chemical agent and Raybon's issuance of the disciplinary report. Therefore, Raybon and Orsa are not entitled to summary judgment on Kornagay's retaliation claim and his Eighth Amendment claim concerning the application of chemical agent.

To the extent Kornagay asserts a separate Eighth Amendment claim based upon Raybon and Orsa's exposing him to residual chemical agent by returning him to a cell that was still contaminated and refusing to move him, Kornagay has not presented sufficient evidence to overcome summary judgment. Assuming the truth of Kornagay's evidence that residual chemical agent remained in his cell, Kornagay has failed to present sufficient evidence to show a genuine issue of material fact as to whether his exposure to chemical residue constituted more than a de minimis use of force, especially in light of the scientific evidence showing the minimal lingering effects of OC, the undisputed evidence that Kornagay was immediately provided a clean mattress, clothes and property, and clean bed linens within two to three hours, and the deposition of Inmate Adkins stating that ventilation fans were operated during the night. Therefore, Raybon and Orsa are entitled to summary judgment on Kornagay's Eighth Amendment claim regarding their exposing him to residual chemicals.

F.    Defendant Grace — First Amendment Retaliation Claim

Kornagay alleges that on October 21, 2008, Grace approached his cell and stated, "So your [sic] the crying little bitch that wants to write everything up? We have something for that kind of shit around here." (Doc. 78 at 8, ¶ 18). Kornagay states Grace then claimed that he (Kornagay) attempted to spit on him and in fact spit on him, and filed two false disciplinary reports in retaliation for his filing grievances (*id.* at 8, 14).

Grace denies he made the statement alleged by Kornagay (Doc. 83, Ex. V, Grace Aff. ¶ 4). Grace additionally denies that he knew Kornagay filed any grievances against Burt, and he denies that Burt ever asked him to retaliate against Kornagay (*id.* ¶ 3). Grace states the disciplinary reports he wrote against Kornagay on October 21, 2008, were motivated by Kornagay's infraction of disciplinary rules, not in retaliation for his filing grievances against Defendant Burt (*id.* ¶¶ 3, 5–7).[11]

---

[11] Grace states he heard loud yelling from Kornagay's cell, and as he approached the cell, he saw Kornagay yelling into the cell vent (Doc. 83, Ex. V, Grace Aff. ¶¶ 5–7). Grace ordered Kornagay to cease his behavior, and Kornagay replied, "Just shut the f[___]k up. You don't want to f[___]k with me." (*id.*). Grace states Kornagay again began yelling into the vent, and he again ordered him to stop (*id.*). Grace states Kornagay replied, "You want some of this here!" and then spat at the cell window just below the vent holes (*id.*). Grace states he contacted the dormitory sergeant, and Kornagay ceased his behavior when the sergeant arrived (*id.*). Grace states that an hour later he conducted a security check and walked by Kornagay's cell, when Kornagay spit an unknown liquid at him through a pen that was stuck through one of the vent holes, striking Grace in the chest (*id.*). Grace called the sergeant to the wing, and Kornagay ceased his disruptive behavior (*id.*).

Kornagay disputes that he engaged in the behavior that led to the disciplinary reports (Doc. 116, Ex. G, Kornagay Decl. ¶ 4). Additionally, Kornagay submitted a declaration of Inmate Hal Lewis, in which Lewis states he was housed with Kornagay on June 8, 2009, and heard Grace state to Kornagay, "I see you're working your way back to the top. I just hope you got your pen under control, because if I hear about any grievances I'll say you tried to stab me next time." (Doc. 116, Ex. E-2, Declaration of Hal Lewis, Oct. 3, 2009). Inmate Lewis states Grace then escorted him to a medical appointment and stated, "You are in the cell with one crying bitch. Every time I hear his name it has something to do with him filing his damn grievances. A few months ago, over in D-Dorm, I had to teach him a lesson about that same shit. He will learn one way or another." (Doc. 116, Ex. E-2, Lewis Decl.).

In light of the evidence produced by Kornagay, there is a genuine issue of material fact as to whether Kornagay engaged in the conduct underlying Grace's disciplinary reports, and whether Grace told Kornagay and Inmate Lewis that he filed the disciplinary reports because of Kornagay's writing grievances. Kornagay has come forward with sufficient evidence showing that he was subjected to the disciplinary reports because of his filing grievances. Therefore, Defendant Grace is not entitled to summary judgment.

G.    Conspiracy Claim

Kornagay claims that Defendants conspired to retaliate against him for filing grievances (Doc. 78 at 12). His conspiracy claim fails, however, because of the intracorporate conspiracy doctrine. "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.*; *accord* Denney v. City of Albany, 247 F.3d 1172, 1190–91 (11th Cir. 2001) (stating "the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' § 1985(3) conspiracy claims for deprivation of their equal protection rights). The doctrine applies to public entities such as state agencies and its personnel. *See* Wright v. Illinois Dept. of Children & Family Servs., 40 F.3d 1492,

1508 (7th Cir. 1994) (holding that intracorporate conspiracy doctrine applies not just to private entities but also to government agencies such as Illinois Department of Children and Family Services); *see also* Grider v. City of Auburn, Ala., 618 F.3d 1240, 1262–63 (11th Cir. 2010) (intracorporate conspiracy doctrine barred plaintiff's § 1983 conspiracy claims against police officers); Denney, 247 F.3d at 1190 (intracorporate conspiracy doctrine applied to city and its personnel); Rehberg v. Paulk, 611 F.3d 828, 854 (11th Cir. 2010) (concluding intracorporate conspiracy doctrine barred § 1983 conspiracy claim against a county employee); Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 767–68 (11th Cir. 2000) (concluding intracorporate conspiracy doctrine barred plaintiff's § 1985(3) conspiracy claim for interference with his civil rights); Chambliss v. Foote, 562 F.2d 1015 (5th Cir. 1977) (affirming district court's summary judgment opinion applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a public university and its officials);[12] Taylor v. Alabama, 95 F. Supp. 2d 1297, 1317–18 (M.D. Ala. 2000) (doctrine of intracorporate conspiracy barred plaintiff's conspiracy claim against employees of state agency).

In the instant case, all Defendants are employees of the FDOC. No outsiders are involved. The subject of their alleged conspiracy—interfering with Kornagay's mail, giving him unsatisfactory notations in his daily housing record, issuing disciplinary reports, and applying force—involved job-related functions well within Defendants' scope of employment as FDOC employees. *See* Grider, 618 F.3d at 1261 (recognizing that one might reasonably believe that violating someone's constitutional rights is never a job-related function or within the scope of a public employee's employment, but holding that the question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally; the scope-of-employment inquiry is whether the employee was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the employee's scope of authority (i.e., job-related duties) and in furtherance of the employer's business). Therefore, Defendants are entitled to summary judgment on Kornagay's conspiracy claim.

---

[12] Decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981 are binding as precedent on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

H.      Official Capacity Claims

An official capacity claim is, in all respects other than name, to be treated as a claim against the entity of which the defendant is an agent.  *See* Graham, 473 U.S. at 166.  To prevail under § 1983 against that entity, a plaintiff must show that the entity itself was the "moving force" behind his constitutional deprivation; and the only way to do that is to identify a "policy or custom [of the entity that] played a part in the violation of federal law."  *Id.*  In the instant case, Kornagay has not identified a policy or custom of the FDOC that played a part in Defendants' alleged retaliation and use of excessive force.  Moreover, the Eleventh Amendment bars his claims for monetary damages against Defendants in their official capacities.  Therefore, Defendants are entitled to summary judgment to the extent they are sued in their official capacities.


I.      Individual Capacity Claims for Compensatory and Punitive Damages

Kornagay does not allege he suffered any physical injury as a result of the alleged retaliatory conduct of Burt, Covan, or Engstrom (namely, interfering with his mail, making notations of unsatisfactory conduct in his daily housing record, and writing false disciplinary reports).  Therefore, pursuant to 42 U.S.C. § 1997e(e), Kornagay is not entitled to compensatory or punitive damages against these Defendants.

As to Defendant Grace, Kornagay alleges that as a result of Grace's retaliatory disciplinary report, he was placed on management meal for seven days and suffered significant weight loss, sleep deprivation, mental anguish, emotional distress, depression, and anxiety as a result (Doc. 78 at 8–9, ¶¶ 21–23; Doc. 116, Ex. G, Kornagay Decl. ¶ 10).  Defendants submitted Kornagay's medical records during the relevant period, October 22–29, 2008, which contain no indication that Kornagay sought medical attention for significant weight loss or any other physical injury resulting from his placement on the management meal (Doc. 83, Ex. Q).[13]  Kornagay did not submit any evidence as to the amount of weight he lost.  Additionally, the inmate depositions submitted by Kornagay actually refute his claim of significant weight loss.  Inmate Malcolm Hodges and Inmate Donnie

---

[13] Kornagay was approved for placement on the management meal on October 22, 2008, and remained on it for seven days (*see* Doc. 83, Ex. J).

Adkins, both of whom allegedly had an opportunity to observe Kornagay's physical appearance during the relevant period, state they did not notice Kornagay's alleged weight loss (Doc. 116, Ex. D, Hodges Dep. # 15, Ex. R-2, Adkins Dep. # 11). Kornagay has failed to present sufficient evidence to support a reasonable inference that he suffered more than de minimis physical injury from placement on the management meal for seven days; therefore, he is not entitled to compensatory or punitive damages against Defendant Grace, even if he succeeds at trial on his First Amendment retaliation claim. The most Kornagay may recover against Grace is a declaratory judgment and nominal damages.

The undersigned reaches the same conclusion as to Kornagay's claims for compensatory and punitive damages against Raybon and Orsa. Kornagay alleges that during the five-day period after Raybon and Orsa sprayed him with chemical agent, he suffered burning lungs and skin, congested breathing, tearing eyes, nasal discharge, dizziness, the sensation of respiratory distress, choking, and burns to his scalp (Doc. 78 at 10, ¶¶ 33–35; Doc. 116, Ex. G, Kornagay Decl. ¶ 6). He further states the medical staff could not administer any treatment to his scalp because they were ordered not to remove his "spit shield," which he had been required to wear after he was convicted of the disciplinary infraction involving Defendant Grace (Doc. 116, Ex. G, Kornagay Dec. ¶ 6).

As previously discussed, Defendants submitted scientific evidence showing that the primary effects of exposure to OC are pain and irritation of the mucous membranes of the eyes, nose, and lining of the mouth (Doc. 83, Ex. Y). OC vapors cause pulmonary irritation and prolonged coughing (*id.*). After a subject is sprayed with OC, an officer only needs to provide water for flushing eyes and skin, as well as proper ventilation (*id.*). No long term effects are known to be caused by OC (*id.*). Additionally, Defendants submitted Kornagay's medical records which show that he reported a burning sensation on his skin, but staff observed no redness to his skin or other injuries (Doc. 83, Ex. Q, pp. 24–25).

As evidence that he suffered physical injury, Kornagay submitted the written deposition of Inmate Hodges, who states that after Kornagay returned to his cell, he heard Kornagay cough, grunt, squeak, spit, sneeze, struggle to clear this throat, and swear (Doc. 116, Ex. D, Hodges Dep. #12). However, Hodges states he did not observe any burn marks or "chemical agent stains" on Kornagay's body after he was sprayed with chemical agent (Doc. 116, Ex. D, Hodges Dep. #13).

Kornagay also submitted the written deposition of Ramziddin Harris, who states that he does not recall seeing burn marks on Kornagay (Doc. 116, Ex. Z, Harris Dep. # 8). Additionally, Inmate Adkins states he does not recall seeing any chemical agent "stains" or burn marks on Kornagay after he was sprayed with chemical agent; and he does not recall hearing sounds from Kornagay's cell throughout the night after he was sprayed (Doc. 116, Ex. R-2, Adkins Dep. ## 10, 12). Hodges and Adkins both state that the air circulation fans on the wing were turned off prior to the officers spraying Kornagay, but Adkins states the fans were turned back on during the night (Doc. 116, Ex. D, Hodges Dep. # 11, Ex. R-2, Adkins Dep. # 4).[14]

Kornagay additionally submitted a declaration of Inmate Saint Juan Walker, who states he has been sprayed with OC approximately four times in thirty-one months (Doc. 116, Ex. N-2, Declaration of Saint Juan Walker, July 26, 2010). Inmate Walker states he experienced difficulty breathing, burning and watery eyes, and burning skin for four to six days after the exposure, even though he was given a cold water shower (Doc. 116, Ex. N-2, Saint Juan Walker Decl.). Inmate Dosia T. Stewart states he has been sprayed with OC and experienced a choking sensation, difficulty breathing, burning eyes and skin, and vomiting (Doc. 116, Ex. O-2, Declaration of Dosia T. Stewart, Aug. 5, 2010).[15]

Viewing the evidence in the light most favorable to Kornagay there is insufficient evidence from which a reasonable inference could be drawn that he suffered more than de minimis physical injury as a result of being sprayed with chemical agent.[16] *See, e.g.*, Mann v. McNeil, No. 09-10995,

---

[14] Inmate Hodges' answer to the question of whether the fans were turned back on during the night is unclear. Kornagay posed the following question, "Do you recall the circulation fans on the wing being turned off prior to Mr. Kornagay getting sprayed? If so were the fans ever turned back on that night?" Hodges responded, "Yes. They (staff) say that is procedure. They turn off exhaust fans so that the gas has a greater effect and so the inmate cannot breath [sic]." (Doc. 116, Ex. D, Hodges Dep. # 11).

[15] Kornagay submitted additional declarations from other inmates describing physical effects they experienced as a result of exposure to chemical agent, including eye irritation, skin irritation, and respiratory irritation for up to four days (Doc. 116, Exs. Z, L-2, M-2). However, none of these inmates identified the chemical agent to which they were exposed.

[16] This conclusion is not inconsistent with the undersigned's determination that Kornagay presented sufficient evidence to survive Raybon and Orsa's motion for summary judgment on his claim of excessive force regarding the application of chemical agent. As previously discussed, although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not whether a quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to

2010 WL 26222, at *1 (11th Cir. Jan. 6, 2010) (unpublished) (under Eleventh Circuit case law, injuries of which prisoner plaintiff complained, including vague injuries to his back, scrapes and marks on his knees and legs, lack of personal items, lapse of time in reordering medication, work assignment of window-cleaning, and discontinuance of pass for showers twice a day, amounted to de minimis physical injuries; therefore § 1997e(e) barred prisoner's claim for damages for mental or emotional injury) (citing Nolin, 207 F.3d at 1258 n.4 and Mitchell, 294 F.3d at 1312–13); Hale v. Sec'y for Dep't of Corr., 345 Fed. Appx. 489, 491 (11th Cir. 2009) (unpublished) (affirming district court's grant of defendant's motion to dismiss prisoner plaintiff's claims for compensatory and punitive damages where prisoner did not produce evidence that he had suffered anything more than minimal or temporary physical effects from his confinement in close management); Quinlan v. Personal Transport Serv. Co., LLC, 329 Fed. Appx. 246, 249 (11th Cir. 2009) (unpublished) (affirming district court's dismissal of § 1983 action for failure to state a claim where detainee alleged that inmate transport company violated his Eighth and Fourteenth Amendment rights when transporting him to prison under unsafe conditions, but detainee did not suffer more than a de minimis physical injury, as required to recover monetary damages for mental or emotional injury pursuant to 42 U.S.C. § 1997e(e), even though he complained of temporary chest pain, headache, and difficulty breathing while in the company's van, and he had periodic episodes of back pain, since none of these conditions required immediate medical attention or evidenced physical injury besides discomfort);[17] Jennings v. Mitchell, 93 Fed. Appx. 723, 725 (6th Cir. 2004) (unpublished) (Eighth Amendment claim for mental anguish brought by prisoner, who was sprayed with pepper spray in response to his refusal to exit shower, was barred by civil rights statute that precludes any claim by prisoner for mental or emotional injury suffered while in custody without a prior showing of physical injury, where prisoner failed to allege or show more than a de minimis physical injury; at no time was prisoner in actual respiratory distress; instead, he merely was uncomfortable in the ordinary fashion of persons exposed to pepper spray); Wolfe v. Bodison, No. 8:09-0261-PMD, 2010

_____

cause harm. See Wilkins, 130 S. Ct. at 1178–79.

[17] The undersigned cites Mann, Hale, and Quinlan only as persuasive authority and recognizes that the opinions are not considered binding precedent. See 11th Cir. R. 36-2.

374567, at *7 (D.S.C. Feb. 2, 2010) (no evidence that plaintiff suffered any injury, other than a de minimis injury, as a result of being sprayed with pepper spray where there was no evidence plaintiff suffered actual respiratory distress; almost all persons suffer a temporary adverse reaction to pepper spray or mace) (quoting Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1200 (9th Cir. 2001) ("Pepper spray is designed to cause intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and a temporary paralysis of the larynx.")); Watkins v. Trinity Serv. Group, Inc., No. 8:05cv1142-T-24MSS, 2006 WL 3408176, at **3–4 (M.D. Fla. Nov. 27, 2006) (prisoner plaintiff's allegations that he experienced diarrhea, vomiting, cramps, nausea, and headaches from eating spoiled food and was treated for food poisoning by medical personnel and placed on medication for three days, did not support compensatory damages award because alleged physical injuries were de minimis; plaintiff experienced the unpleasant physical conditions for only a short time after eating the spoiled food, and the injuries did not require a "free world person" to visit an emergency room, have a doctor attend to, give an opinion on, diagnose, or prescribe medical treatment for the injury); Reeves v. Jensen, No. 5:04-CV-194, 2005 WL 2090896, at **1–2 (W.D. Mich. Aug. 30, 2005) (even assuming that plaintiff "bec[ame] ill" and had to be removed from his cell after officers used chemical agent on another prisoner, plaintiff suffered at most only de minimis physical injury and was treated using medications he had already been receiving; therefore, plaintiff had no claim for relief, under § 1997e(e), for any mental anguish he experienced as a result of not being moved before use of chemical agent on other prisoner); Teel v. Barnett, No. 7:01-CV-033-R, 2002 WL 737070, at **1–2 (N.D. Tex. Feb. 28, 2002) (plaintiff's suffering burning sensation in groin area from use of chemical agent did not constitute "physical injury" as required under § 1997e(e)); Osterback v. Ingram, No. 3:96cv580/LAC/SMN, 2000 WL 297840, at *10 (N.D. Fla. Jan. 12, 2000) (plaintiff unable to recover compensatory or punitive damages with respect to injuries caused by placement in disciplinary confinement or close management, pursuant to § 1997e(e)), where plaintiff's physical injuries, including "extreme pain and suffering from being exposed to residual chemical fumes" sprayed on other prisoners which caused him to suffer a "serious, debilitating sinus condition," and "overall loss of muscle tone, a gaining of body fat, a loss of cardiovascular and pulmonary health, developed skin and scalp conditions . . ., migraine headaches, bouts of sleeplessness and

listless[ness], among other things," were not more than de minimis). Therefore, Kornagay's claims for compensatory and punitive damages against Defendants Raybon and Orsa should be dismissed, and he should be entitled to recover only nominal damages and declaratory relief.

V.      CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the undersigned concludes that Defendants' motion for summary judgment should be granted in part.

Accordingly it is respectfully **RECOMMENDED**:

1.      That Defendants's motion for summary judgment (Doc. 83) be **GRANTED IN PART** only to the following extent:

        a.      Plaintiff's claims against Defendant Gielow be **DISMISSED**;

        b.      Plaintiff's Eighth Amendment claim against Defendant Raybon based upon his maintaining Plaintiff on the special management meal for seven days be **DISMISSED**;

        c.      Plaintiff's Eighth Amendment claims against Defendants Orsa and Raybon based upon their exposing him to residual chemical agent by returning him to a cell that was not sufficiently decontaminated be **DISMISSED**;

        d.      Plaintiff's conspiracy claim be **DISMISSED**;

        e.      Plaintiff's claims against Defendants in their officials capacities be **DISMISSED**; and

        f.      Plaintiff's claims for compensatory and punitive damages against Defendants in their individual capacities be **DISMISSED**.

2.      That Defendants's motion for summary judgment (Doc. 83) be otherwise **DENIED**.

3.      That this case be remanded to the undersigned for further proceedings.

At Pensacola, Florida, this 8th day of February 2011.

                                        /s/ Elizabeth M. Timothy
                                        **ELIZABETH M. TIMOTHY**
                                        **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).